89 N.J. Super. 234 (1965)
214 A.2d 526
McCRORY STORES CORPORATION, PETITIONER-RESPONDENT,
v.
THE CITY OF ASBURY PARK, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 20, 1965.
Decided November 8, 1965.
*236 Before Judges SULLIVAN, LEWIS and KOLOVSKY.
Mr. Norman Mesnikoff argued the cause for appellant.
Mr. Lawrence Lasser argued the cause for respondent (Messrs. Lasser & Lasser, attorneys).
The opinion of the court was delivered by KOLOVSKY, J.A.D.
For the year 1962 property known as 632-644 Cookman Avenue, Asbury Park, was assessed for taxation at a valuation of $521,000 (land $277,200, improvements $243,800). The county board of taxation affirmed the assessment. The Division of Tax Appeals (Division) reduced the assessment to $325,000 (land $200,000, improvements $125,000). The city appeals.
The petitioner named in the appeal from the assessment is McCrory Stores Corp. (McCrory), describing itself as "Tenant, Taxpayer and Agent of the Owners," recited to be "Realty Improvement Inc. and Frall Realty Co." The property, which is occupied by McCrory's subsidiary, H.L. Green Co. (Green) as a retail variety store, was leased to McCrory in 1956 for a term of 40 years, at an annual net rental of $41,000. By deed dated December 14, 1960 the owner of the entire property sold the westerly half thereof to Frall Realty Corp. and The Ritter Foundation for $288,000.
632-644 Cookman Avenue is in the heart of the downtown Asbury Park retail shopping area, although, according to McCrory's experts, land in the 500 block to the east, influenced by the presence of the Steinbach Department Store on the north side of the street, is more valuable. The property consists of a rectangular tract of land extending from the south side of Cookman Avenue to the north side of Lake Avenue, a depth of 200 feet, with a frontage of 100 feet on each avenue. Entrance to the building on the property, a part one- and part two-story building and basement, is afforded from both avenues. Originally consisting of two 50-foot wide buildings, one of which had been occupied for years by Green, the two *237 buildings were altered and remodeled in 1956 into one building, described by Hannoch, one of the taxpayer's experts, as "an attractive building" with an "aluminum, plate glass, face brick and marble store front, asphalt tile covered wood floor, fluorescent lights, painted walls, unit heaters and fully air conditioned."
The entire first floor (estimates of whose area vary from 18,000 to 18,500 square feet) and some 4500 to 5000 square feet of the basement are used as selling space. Some 3500 square feet of the basement area are used for storage. The second floor portion (estimated by the city's expert to contain 10,400 square feet) is used for storage, stock rooms and rest room facilities.
At the hearing before the Division the city relied on the testimony of one real estate expert, Robert J. Rubenstein. McCrory called three witnesses: two real estate experts, John D. Lazarus and Franklin Hannoch, Jr., and David Greenwald, its vice-president in charge of real estate.
Greenwald listed the gross sales of the Green Store over the years and testified that the annual gross rental cost to McCrory was approximately $62,500 (net rental $41,000 plus real estate taxes $18,000, plus maintenance, repairs and insurance $3500); that "it costs us approximately 12% to do business in the Asbury Park H.L. Green Store."
Lazarus valued the property at $330,000 (land $165,000, building $165,000) using two methods of valuation: one, the "cost or summation approach" (reproduction cost, depreciated), the other, the "income approach." In using the first method, he estimated a building reproduction cost of $301,400, deducted 40% for depreciation to reduce the building value to $180,840, and added a land valuation of $165,000 ($1650 per front foot) for a total value of $345,840.
For the income approach Lazarus, by taking 7% of $495,000 which he said were Green's gross sales for 1961, calculated an annual rental income of $34,650 before taxes and expenses, capitalized $34,650 at 11% ("7% for interest and recapture and 4% for taxes, insurance and maintenance") *238 and reached a valuation of $315,000. His final valuation, $330,000 was midway between the valuations resulting from the two approaches.
Actually, however, Green's 1961 gross sales were $551,785, not $495,000. Application of Lazarus' income value formula to the correct amount would result in a valuation of $351,100 instead of $315,000.
Lazarus described at some length the conditions that have adversely affected retail sales in and the rental value of property in the retail shopping area of Asbury Park, which "has always been regarded as the largest shopping center in Monmouth County." These included the opening of the Garden State Parkway in 1954, providing easy access from Monmouth County to stores in Essex, Union and Morris Counties, and the opening of various shopping centers in Monmouth County in the years from 1955 to 1960.
Hannoch, too, used two methods of valuation to reach a "fair market value" of $324,000, apportioned: land $165,000, building $159,000. In the "physical approach" (reproduction cost, depreciated), he estimated the building reproduction cost at $319,500, deducted 50% ($159,750) for depreciation, and added a land valuation of $165,000 for a total of $324,700.
In the income approach, he considered leases and sales in the 600 block and concluded therefrom that the property under appeal had an annual rental value of $400 per front foot, or a total of $40,000 per year. "As a check," he took into consideration the sales volume in the store, which he noted as $737,000 in 1957 and approximately $500,000 in 1961, and "stabilized" the gross sales at $600,000. He pointed out that "even a 6% allowance" as rental value would total only $36,000. However, he estimated a gross annual rental income of $40,000, deducted a total of $2800 for insurance, repairs and management (although the individual items listed actually totalled $4800), for a net income before taxes of $37,200 which he capitalized at 11 1/2% ("interest on land and building at 7%; depreciation on the building is 2%, however the building represents only one-half of the total, so *239 that I took * * * 1% in an over-all rate;" 3 1/2% for taxes) to give a total valuation by the income approach of $322,500.
Rubenstein, testifying for the city, said that he used three approaches to value in reaching his final valuation of $520,000. In addition to the cost or summation and the income methods of valuation used by McCrory's witnesses, he considered the sale on December 14, 1960 of the westerly half of the property for $288,000 indicating to him a sales value of $576,000 for the entire property. Rubenstein noted that his value was approximately 10% less than that sale. While he knew of other sales of properties in the area, he deemed them not comparable to the subject property.
Using the cost or summation approach, Rubenstein calculated a building replacement cost new of $339,900, deducted 25% for depreciation, leaving a depreciated value of $255,000, and added a land valuation of $277,200 ($2000 per front foot plus 26% for depth in excess of 100 feet and 10% for two street frontages), making the total valuation by this method $532,000.
For the income method of valuation, Rubenstein "established" a gross annual rental value of $3 a square foot for the first floor and $1.05 per square foot for the basement space, or a total of $63,000, by considering various leases in the area, including leases of what he deemed the two most comparable properties in the block, the Newberry store which adjoined the Green store on the east and the Woolworth store located 50 feet to the west. From a gross annual income of $63,000, he deducted $8,400 as an allowance for vacancies, insurance, repairs and replacements and management, leaving an annual income before taxes of $54,600. On the basis of a building valuation of $255,000 (his estimate of reproduction cost, depreciated) and a capitalization rate of 11.6%, he estimated the net income attributable to the building at $29,580. The remainder, $25,020, he attributed to the land and capitalized that amount at 9.5% for a land value of $263,350, which, added to the building value of $255,000, resulted in a total valuation of $518,350.
*240 The city complains  in our opinion justifiably so  because the Division rested its determination as to the value of the property solely on a formula based on the sales volume of the Green store. In reaching its conclusion, the Division said:
"All experts used the economic approach in examining the value of this property. A witness for the city started with a rental value of $63,000 which he had derived from a comparison of rents actually being paid in the Woolworth store and other properties on the block. The two witnesses for the taxpayer began with $40,000 and $35,000 respectively derived primarily from a percentage of gross sales. I find the gross potential income of this property through an application of percentage of sales, not because I am convinced of the objectivity of such a computation, but because I have no other. I am also estimating sales from on or about the assessment date at the highest potential and I shall take the highest possible ratio of sales to rent. I find the gross potential income to be $42,000 being 7% of sales of $600,000. One of the taxpayer's experts testified that expenses could be estimated at $4,800 and I shall accept this. I therefore find that the net income before taxes is $37,200.
The value of this parcel is approximately evenly divided between land and building.[1] If we therefore assume a 6% rate of return to the land and 8% to the building, which would appear to be proper rates of return, we have an overall capitalization rate for return of 7%. To this should be added 3 1/2% for the current tax rate and an additional 1% (1/2 of 2%) for depreciation of the building. By the application of this capitalization rate of 11 1/2% to the net income of $37,200, I determine an economic value to the property of $323,500. I therefore find the market value of the entire parcel to be $325,000, which I allocate as follows: Land $200,000, Building $125,000, Total $325,000." (Emphasis added)
We cannot agree with the Division's analysis. In seeking the true value of real estate for tax assessment purposes, consideration may be given to rental income as well as to cost less depreciation and sales of comparable property. But as the Supreme Court has said, the capitalization of income approach must be used with care and "one should hesitate to accept its answer without checking against all available data." New Brunswick v. Div. of Tax Appeals, 39 *241 N.J. 537, 544 (1963). "Mathematical calculations in appraisals, though made in the best of faith, can lead to divergent results and should be closely scrutinized." Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 106 (1952). The Division failed to heed the quoted caveats.
Nor can we agree that the Division was warranted on the record in this case in using a formula based on Green's gross sales to estimate the fair rental value of the property. It may be noted that only Lazarus, of all the expert witnesses, used a gross sales formula in arriving at rental value, and as appears supra, his calculations were in error. Hannoch, McCrory's other expert, reached his opinion as to rental value by considering rentals of other stores in the block, and then "as a check" used a gross sales formula.
Apposite is what the court ruled in Aetna Life Ins. Co. v. Newark, supra, after discussing out-of-state cases which have rejected "this type of evidence as a test for full and fair value of property for assessment purposes":
"In the present case the theory asserted is a formula based on sales volume and therefore is subject to the variables of goodwill and management practices which are factors entirely foreign to the true value of the real estate as such. For this reason the evidence adduced in this category was neither competent nor sufficient to establish the fair and full value of the property." (10 N.J., at p. 109)
Moreover, there was other testimony as to value, reached by application of approved methods of valuation, to aid the Division in determining true value.
"Reproduction cost, depreciated" is recognized as a permissible approach to value. New Brunswick, supra, 39 N.J., at p. 543; Passaic v. Gera Mills, 55 N.J. Super. 73, 82 (App. Div. 1959). That approach was used by all three experts. Their estimates of building reproduction cost differed but little. The area of dispute was in the depreciation rate to be applied, Lazarus using 40%, Hannoch 50% and Rubenstein 25%. The Division's expertise should enable it to properly weigh and evaluate the reasons given in support of the *242 respective depreciation rates and reach a conclusion as to the present value of the building.
The Division's findings do not discuss the testimony as to reproduction cost nor indicate what, if any, consideration was given thereto. The Division's only reference to building value is to be found in its allocation of the $325,000 which it found to be the market value of the property. No explanation is given for the allocation to the building of $125,000, a value which is less than that testified to by either the city's or McCrory's experts. If the $200,000 land allocation reflects an effort to insure uniformity of land valuations in the block, the $125,000 building allocation would appear to bear no relation to actual building value and to represent only the residue of the $325,000 value which the Division reached by application of the formula based on gross sales.
Nor do the Division's findings make it clear why, if it was to use the "income approach," the actual rental being paid by McCrory and rentals being paid for other commercial properties in the area were of no aid in determining fair rental value of 632-644 Cookman Avenue.
We may pass without comment the suggestion that none of the rentals of neighboring store properties relied on by Rubenstein and Hannoch, respectively, in estimating the fair rental value of the property under appeal actually afforded a basis for comparison.
However, the rental actually being paid by McCrory under its lease, "$41,000 a year net plus taxes of $18,000 and maintenance, repairs and insurance," is in a different category. The Division gave no explanation as to why the actual rental should be completely disregarded. It merely commented, "we must [because of the history of Green's retail sales generated in this property] approach with caution the lease of 1956 and the conclusions to be drawn from the existing rental situation." Hannoch, McCrory's expert, whose $324,000 valuation was but $1,000 less than that found by the Division, testified that he "considered but disregarded" the existing lease to McCrory because he "did not think it *243 represented rental value." Asked whether the existing rental was a factor to be considered in arriving at his opinion, he replied:
"Not for tax purposes. For sales, for market value, for sales purposes this property would sell, based on that 41,000 net lease, there is no question about it, but in order to arrive at a uniformity for tax purposes, we have to start out by estimating fair rental value."
There is no warrant for the suggested distinction between market value for sales purposes and market value for tax purposes. For tax purposes, too, as the court said in New Brunswick v. Div. of Tax Appeals, supra, 39 N.J., at p. 543, "the search, of course, is for the fair value of the property, the price a willing buyer would pay a willing seller."
It is true, as the court said in New Brunswick, that in using the income approach "the fair rental value, rather than the actual rent payable under an existing lease, must control" (at p. 544), citing Somers v. City of Meriden, 119 Conn. 5, 174 A. 184, 186-187, 95 A.L.R. 434 (Sup. Ct. Err. 1934), annotated 95 A.L.R. 442 (1935); People ex rel. Gale v. Tax Comm'n of City of New York, 17 A.D.2d 225, 233 N.Y.S.2d 501, 506-507 (App. Div. 1962). But as the cited authorities clearly indicate, this does not mean that the actual rent is to be disregarded. On the contrary, in Somers v. City of Meriden, supra, the Connecticut court said:
"The trial court correctly held that in the situation here presented `in determining what is fair rental income, the actual rental income, while not controlling, is an element to be considered.'" (174 A., at p. 186)
"The fact that property is under lease is a relevant and, if for an extended term, an important consideration. Leases soon to expire or tenancies at will, involving possibilities of early vacancies or lowering of rents, or long-term leases at rentals inadequate when measured by prevailing standards tend to impair, and equally, leases having a long term yet to run and reserving relatively high rents measurably appreciate present value." (Ibid., at p. 187)
In People ex rel. Gale v. Tax Comm'n of City of New York, supra, the court said:
*244 "An outstanding lease may be a benefit or a detriment to the subject property, and thus its duration, covenants and the rental fixed are simply elements along with many other considerations used to arrive at the value of the property. The amount of rental fixed by a lease, even though negotiated at arm's length, could be very misleading, as to the true value of property, for it is well known that many rental contracts may be at excessive or inadequate rentals because of poor business judgment on the part of one party or another. Then, too, long term rental contracts may be made in boom times or in times of depression, so do not necessarily reflect true value on a change in times. And, as Mr. Justice Bergan, sitting in this court, has very appropriately said, `Assessments cannot be made to trail behind every turn in the fortunes of real property. There are times when property must bear a share of taxation proportionate to value even though it may then have no income, or an income inadequately focused to true value. There are times when the full measure of ephemeral surges of increased income should not be reflected in assessments in fairness to the owner.' (People ex rel. 379 Madison Ave. v. Boyland, 281 App. Div. 588, p. 590, 121 N.Y.S.2d 238, p. 241)
Of course, an outstanding bona fide lease and the rental income established thereby are matters to be considered in determining `the full value' of the whole property, land and improvements. Value arrived at by capitalization of the fair rental value is, in ordinary cases, the surest guide to a sound appraisal. In that connection, the actual rent realized is significant as an important factor in determining what the fair rental value is. * * * But when there is evidence that factors such as long-term leases made under distress or boom conditions affect the actual rent, the weight to be given to the actual rent must be discounted accordingly." (233 N.Y.S.2d, at p. 506)
But power to discount the weight to be given the actual rent would hardly seem to justify disregarding it completely in this case and adopting a rental value computed by a formula based on sales volume which is "subject to the variables of good will and management practices." If anything, the inability of the Division to determine the fair rental value from a consideration of the McCrory rental and the rentals being paid for other commercial property in the area suggests that it should have adopted some recognized approach to value other than the income approach.
One final observation must be made with respect to the Division's determination that the December 1960 sale of one-half the subject property less than ten months before the assessing date, October 1, 1961, "must be disregarded."
*245 Certainly the sales price of the premises in question is not controlling, but it is evidential. Hackensack Water Co. v. Division of Tax Appeals, 2 N.J. 157, 162 (1949); Rek Investment Co. v. Newark, 80 N.J. Super. 552, 559 (App. Div. 1963).
In evaluating a sale of the premises involved in an appeal,
"* * * the Division [is] required to weigh and appraise the factors surrounding the sale to determine whether there were special circumstances which had a tendency to increase or depress the sales price of the property without affecting its true value, or whether, in the particular circumstances, the sale price was controlling." Rek Investment Co. v. Newark, supra, at p. 560
Such "special circumstances" have been held to include the abnormal condition of the real estate market, Plainfield v. State Board of Tax Appeals, 127 N.J.L. 5, 6 (Sup. Ct. 1941); the fact that the property was the last piece of property owned by a trust going out of the real estate business, Rek Investment Co. v. Newark, supra; a situation where the building was a special purpose warehouse "closely connected with and dependent on [a] railroad and its facilities," Harborside Warehouse Co., Inc. v. Jersey City, 128 N.J.L. 263, 265 (Sup. Ct. 1942); and a case where the sale involved a lease-back and an income tax saving by reason of the capital loss involved. L. Bamberger & Co. v. Division of Tax Appeals, 136 N.J.L. 463 (Sup. Ct. 1948), affirmed 1 N.J. 151 (1948).
The Division ruled that:
"* * * this sale must be disregarded in determining the value of the property since the overwhelming consideration of the purchaser was the income which could be derived from a very responsible tenant through the existing lease on the property. Consequently I find that the purchaser in this instance was buying and paid for, not a parcel of real property, but a measure of income."
That is not a special circumstance or a reason for completely disregarding the sale. On the contrary, the logical justification for the income method of valuation is the
*246 "* * * common knowledge that a prospective investor in realty expects a fair return upon any investment he makes, and, before investing, studies the income history of the property and considers its income-producing potentiality." Annotation "Income or rental value as a factor in evaluation of real property for purposes of taxation," 96 A.L.R.2d 666, 669 (1964)
Reversed and remanded to the Division for retrial. No costs.
NOTES
[1] But note  the Division's final allocation was land $200,000, building $125,000.