CRABTREE, J.T.C.
This is a local property tax case wherein plaintiff seeks review of a judgment of the Essex County Board of Taxation reducing the 1981 assessment on defendant’s property located at 1125-1127 Clinton Avenue, Irvington, New Jersey (Block 84, Lot 60). Plaintiff asks for a restoration of the assessment while defendant counterclaims for a further reduction.
The assessment and county board action thereon were:
*423 Land
Improvements
Total
Assessment
$ 87,600
118,200
$205,800
County Board Judgment
$ 87,600
73,400
$161,000
At issue are the true value of the property and whether defendant is entitled to discrimination relief pursuant to N.J.S.A. 54:2-40.4 (Chapter 123).
The subject of the controversy is a one- and two-story store and office building of masonry construction containing approximately 20,500 square feet. The improvement is sited on 15,476 square feet of land near the intersection of Clinton Avenue and Linden Avenue. The land has frontage on Clinton Avenue of 64.9 feet and a depth of about 200 feet.
On the assessing date the property was occupied by five tenants, two on the first floor and three on the second. 2000 square feet of rentable space on the second floor was vacant. The contract rents and the space occupied by those tenants were as follows:
Tenant
Dubman
Flax
Dr. Mouring
Geo. Jones
Claude Jones
Floor
First
First
Second
Second
Second
Sq. Ft. Area
6,000
11,500 *
800
750 1,000
Rental
$15,000
12,600
5,313
4,500
7,200
Per Sq. Ft.
$2.50
1.10
6.64
6.00
7.20
The actual annual income of the property in 1980 was $44,613, while the expenses, exclusive of taxes and management fees, approximated $27,000. Plaintiff’s tax rate for 1980 was $6.84 per $100 of assessed valuation.
Defendant is a partnership composed of Robert Dubman and Joseph Kremer, who are equal and unrelated partners. Dub-man, a dentist, conducts his professional practice in the first *424 floor space, as indicated, pursuant to a five-year lease, which began January 1, 1979. The lease contains renewal options for four additional five-year terms. Dubman’s quarters are well maintained and tastefully appointed and they evidence substantial expenditure for tenant improvements. According to the lease, those improvements, except for dental and laboratory equipment, become the property of the landlord.
Next door to Dubman’s office is a children’s furniture store operated by Ruby and Jack Flax, Inc. (Flax). The Flax lease was executed on November 13, 1979 and covered the period January 1, 1980 to December 31, 1982. It contained the following essential provisions:
(a) the monthly rental was $1,050;
(b) the tenant was given two three-year renewal options at a monthly rental of $1,200 for both renewal terms;
(c) during the initial lease period and the first renewal period the landlord supplied the heat.
The lease differed from the prior lease, which expired on December 31, 1979, in four significant respects:
(1) rent payable during both renewal terms was the same, i.e., $1,200 per month; whereas the old lease increased the monthly rent to $1,300 during the second renewal period;
(2) the landlord was obligated to furnish heat through the end of the first renewal period; during the last year of the old lease and throughout both renewal periods thereunder the tenant was to furnish its own heat;
(3) under the new lease the tenant had a right of termination, upon notice, at the end of any calendar year during the term of the lease, including renewal periods, in the event of “adverse economic conditions;"
(4) the new lease eliminated the prior provision requiring the tenant to pay 42‘/2 of the property taxes.
All other terms and conditions of the old lease were incorporated by reference in the new lease.
Although no evidence was introduced concerning the inception dates and duration of the second floor leases it appears from the evidence pertaining to tax and utility payments that those leases covered more than one year.
The subject property was encumbered by a first mortgage held by Village Bank of New Jersey, the principal balance of which was approximately $141,200 on July 31, 1979. The mortgage contained a “due-on-sale” clause according to which the *425 mortgagee, at its option, could declare the entire principal balance of the mortgage debt immediately due and payable if the property subject to the mortgage were sold or transferred without the mortgagee’s consent.
In a transparent effort to circumvent the due-on-sale clause, defendant, on July 31, 1979, entered into an agreement, cast in the form of a lease of the entire property, with one Dieter Braun, whereby the latter became unconditionally liable for monthly payments to defendant of $1,677.57 for 77 months beginning September 1, 1979, with an additional sum of $22,800 payable simultaneously with the last monthly payment. Of each monthly payment, $1,497.57 represented the monthly payment due on the first mortgage, which was amortized on a direct reduction basis. The balance of $180 represented the amortization, also on a direct reduction basis, of $27,000 with interest at 6% per annum, over 77 months, with a final “balloon” payment of $22,800. The agreement gave Braun the option to purchase the property and provided for delivery of a bargain and sale deed at closing. Finally, the parties made provision in a separate document for Braun’s default. In that event he was liable for the remaining balance of the $180 portion of the monthly payments, plus the final payment of $22,800.
Immediately following execution of the agreement Braun took possession of the property; and the leases thereon were forthwith assigned to him. It was Braun, not a representative of defendant, who negotiated the November 13, 1979 lease with Flax. No deed was ever executed with respect to the transaction between defendant and Braun; nor was the agreement ever recorded. Defendant treated Braun’s monthly payments made pursuant to the agreement as rental income on its partnership income tax return and claimed deductions thereon for property taxes, depreciation and mortgage interest.
Plaintiff’s expert, using the income approach exclusively, estimated the true value of the subject property on October 1,1980 to be $320,000. In reaching this conclusion he stabilized the rentals for Dubman and Flax at $4 per square foot and $3 per *426 square foot, respectively. He offered no comparable leases in support of these adjustments but chose to rely upon his extensive experience in the appraisal of properties in Essex County in general and in Irvington in particular. He accepted the contract rents paid by the three second floor tenants as economic rent and ascribed a rental value of $6 per square foot to the 2,000 square feet of vacant second floor space. From the economic gross income thus derived he subtracted a 5% vacancy and loss allowance and $31,156 in expenses to arrive at effective net income of $51,969, which he then capitalized at 16.24% (including an effective tax rate of 4.74%).
Defendant’s expert estimated the true value of the subject property on the assessing date to be $165,000. In reaching this conclusion he relied upon the income approach and upon the transaction with Dieter Braun, which he regarded as a sale of the subject property. In developing his economic income, he accepted the rental under the Flax lease as indicative of economic rent, he made an upward adjustment to the contract rent payable under the Dubman lease, and he adjusted the second floor contract rentals downward. To the economic gross income thus derived he applied vacancy and loss factors of 5% to the first floor and 33ys to the second floor, producing an effective gross income of $53,952. From this amount he subtracted expenses of $25,732 to arrive at imputed net income of $28,220, which he capitalized under the building residual method at 19.74% (including an effective tax rate of 4.74%) to reach a value of $163,400. Like plaintiff’s expert, defendant’s expert failed to offer comparable leases in support of his estimates of economic rent. Instead he chose to rely upon lease offerings, without submitting any particulars thereof.
 I reject the income approach used by both experts, as their respective estimates of economic rent lack evidentiary support. Plaintiff’s expert relied upon his experience, while defendant’s expert purported to utilize lease offerings. Estimates based upon an expert’s experience are insufficient in tax valuation cases. Genola Ventures v. Shrewsbury, 2 N.J.Tax 541 *427 (Tax Ct.1981). Lease offerings, like sales offerings, are not probative of market value. They merely reflect the top of the range. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7 ed. 1978) 293-294. In addition, defendant’s expert offered no enlightenment on the nature of the alleged lease offerings, such as the location of the properties, whether the leases were gross or net, the services provided by the owners and duration of the leases.
Judicial inquiry into valuation under the income approach cannot proceed without satisfactory proofs of economic rent. Rodwood Gardens, Inc. v. Summit, 188 N.J.Super. 34, 455 A.2d 1136 (App.Div.1982). Thus, an examination of vacancy and loss allowances, expenses and capitalization rates posited by the experts is not required in this case.
In reaching the foregoing conclusions regarding the income approaches employed by the experts, I have not ignored the actual rents, which are some evidence of economic rent and must be given consideration. McCrory Stores v. Asbury Park, 89 N.J.Super. 234, 214 A.2d 526 (App.Div.1965). However, it is the economic rent, not the contract rent, which controls for tax valuation purposes. New Brunswick v. State of N.J. Div. of Tax Appeals, 39 N.J. 537, 189 A.2d 702 (1963); Buchler v. Fort Lee, 2 N.J.Tax 228 (Tax Ct.1981). In this case it is impossible to conclude from the evidence that the Dubman lease reflects economic rent for the space demised. The substantial, but unspecified, expenditures for tenant improvements, some of which became the landlord’s property, some of which were removable by the tenant upon termination of the lease, were bound to have some effect upon the rent negotiated in the lease. Moreover, the lease was not an arms’ length transaction as Dubman was a 50% partner in the partnership that owned the building. That position, while perhaps not enabling him to dictate the terms of his own lease, certainly gave him a power to veto any lease provisions not to his liking. Finally, there is no evidence to indicate that the terms of the Dubman lease, including its four renewal options involving modest rent increases, *428 were consistent with prevailing market conditions governing long-term leases of professional office space.
The Flax lease, executed in November 1979, has about it the aura of desperation. The old lease for this tenant, who occupied over 50% of the rentable space in the building, was less than two months from its expiration; 2,000 square feet on the second floor, constituting 10% of the building’s rental space, was vacant; the new owner was faced with monthly payments to defendant of $1,677.57, average expenses (exclusive of taxes and management commissions) of $2,250 monthly and taxes approximating $1,170 per month, with only $3,717 in monthly rents to cover all these charges. Under these circumstances Flax could dictate his own terms, and it appears that he did just that. The new lease (1) eliminated the tenant’s obligation to pay 42V2% of property taxes, (2) postponed a rent increase for three more years, at which time the rent was increased from $1,050 to $1,200 per month, where it would remain for six years, (3) shifted the obligation to supply heat from the tenant to the landlord and (4) allowed the tenant to terminate the lease at the end of any year in the event of “adverse economic conditions,” which the instrument fails to define. The negotiating advantage, it will be seen, rested entirely with the tenant, and the landlord’s concessions were actuated by dire economic compulsion. The relative equality of bargaining power which under-girds the concept of market rent was thus lacking. The Flax lease did not reflect economic rent.
The foregoing conclusions with respect to the Dubman and Flax leases, which cover more than 85% of the building’s rentable space, renders an analysis of second floor rentals unnecessary.
Having disposed of the parties’ respective contentions concerning the income approach, we turn our attention to the Braun transaction as evidence of the property’s true value. It is well settled that the selling price of real property involved in a judicial determination of its taxable value is a guiding indicium of fair value and might well be controlling, provided that all *429 facts and circumstances are weighed and appraised. Hackensack Water Co. v. Div. of Tax Appeals, 2 N.J. 157, 65 A.2d 828 (1949); L. Bamberger & Co. v. Div. of Tax Appeals, 1 N.J. 151, 62 A.2d 389 (1948); Halocarbon Products v. South River, 1 N.J.Tax 294 (Tax Ct.1980), aff’d o.b. per curiam 181 N.J.Super. 1, 436 A.2d 532 (App.Div.1981). Our inquiry into the Braun transaction will be pursued along two lines. First, was the transaction, cast in the form of a lease, really a sale? Secondly, if a sale was involved, what was sold?
The indispensable characteristic of any sale is a shift in the risks and benefits of ownership. Niktan Realty Co. v. City of Passaic, 1 N.J.Tax 393 (Tax Ct.1980). See Commissioner v. Brown, 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965). Thus, where a long-term contract of sale is executed and the contract purchaser takes immediate possession of the property, a sale has occurred even though conveyance of legal title is deferred. Century Fed. Sav. & Loan Ass’n v. Van Glahn, 144 N.J.Super. 48, 56, 364 A.2d 558 (Ch.Div.1976); First Fed. Sav. & Loan Ass’n v. Wick, 322 N.W.2d 860 (S.D.Sup.Ct.1982). More specifically, a sale of a garden apartment complex was held to have taken place where, immediately following execution of a long-term contract of sale, the purchaser entered into possession, took control of management, collected the rents and paid all operating expenses. The fact that no deed conveying legal title was to be executed for eight years was irrelevant. Society for Savings v. Bragg, 38 Conn.Supp. 8, 444 A.2d 919 (Sup.Ct.1981). While these last three cases (Van Glahn, Wick and Bragg) involve mortgage foreclosure actions grounded on the alleged breach of “due-on-sale” clauses, they provide illuminating analogies to tax valuation cases. The relevant statute, N.J.S.A. 54:4-23, directs the assessor to value real property as though it were sold pursuant to private contract on the assessing date. This involves a determination as to what the property would bring in exchange for money (or an unconditional obligation to pay money). Newark v. Vernon Tp., 1 N.J.Tax 90 (Tax Ct.1980), aff’d per curiam 179 N.J.Super. 332, 432 A.2d 106 (App.Div. 1981). The inquiry in both cases, the foreclosure actions and tax *430 valuation proceedings, is thus whether the payments made or obligated constitute consideration for a change in ownership, i.e., a sale of the owner’s interest in the property.
The overriding intention of the parties to the Braun transaction was to consummate a sale of defendant’s interest in the subject property. Braun took possession immediately upon execution of the agreement; he was entitled to collect all the rents; he negotiated a new lease with Flax in his own name, without consulting defendant; and he was unconditionally obligated to pay defendant a sum certain at specified times. Although the Braun agreement provided for an option to purchase the property, this “option” was mere window dressing, as Braun was obligated for the payments contemplated by the agreement irrespective of his exercise of the option. The evidence concerning defendant’s income tax treatment of income and deductions with respect to the property following execution of the Braun agreement, while perhaps indicative of a contrary intent, is simply outweighed by the evidence of an intention of the parties to the agreement to effectuate a sale.
The next question to be resolved is: what did the parties sell? The answer to this question is critical to the resolution of the issue before this court. Most assuredly, the selling price of real property will reflect the burden of long-term leases disadvantageous to the landlord; and as indicated above, N.J.S.A. 54:4-23 requires that property be valued as though sold under private contract on the assessing date. However, the price paid by the buyer for property encumbered by disadvantageous leases is a payment for the leased fee estate of the landlord, a partial interest in the property. The Appraisal of Real Estate, supra at 461. The tenants have a leasehold interest in such property measured by the difference between their actual rent payments and the economic rent. Id. at 337, 432 A.2d 106; Dworman v. Tinton Falls, 1 N.J.Tax 445 (Tax Ct.1980), aff’d o.b. per curiam 3 N.J.Tax 1, 180 N.J.Super. 366, 434 A.2d 1134 (App.Div.1981). Tax assessments must comprehend the value of all interests in real property. Secaucus v. Damsil, Inc., 120 N.J.Super. 470, 295 *431 A.2d 8 (App.Div.1972); Tower West Apt. Ass’n v. West New York, 2 N.J.Tax 565 (Tax Ct.1981), aff’d per curiam 5 N.J.Tax 478 (App.Div.1982).
In this case the economic rent, for the reasons given, was not established. The only certainty in this respect is that the contract rents paid by Dubman and Flax were not the economic rent. It can also be said, with complete confidence, that the rent payable under the Flax lease, given the circumstances of its execution, is less than the economic rent. Accordingly, the only conclusion that can be reached is that the sale represented by the Braun agreement was a sale of defendant’s leased fee estate which was less than all the interests in the property. The sale, therefore, does not reflect the true value of the property on the assessing date.
As defendant has failed to establish the true value of its property, its discrimination claims need not be addressed. Greenwald v. Metuchen, 1 N.J.Tax 228 (Tax Ct.1980).
As neither party has met its burden of overcoming the presumption of correctness of the county board judgment, Warren v. Jackson Tp., 1 N.J.Tax 536 (Tax Ct.1980), I will direct the entry of judgment affirming the judgment of the county board.

 Include 3,000 square feet in basement