553 So.2d 1203 (1989)
Ronald J. SCHULTZ, As Property Appraiser of Pinellas County, Florida, and Randy Miller, As Executive Director of the Department of Revenue of the State of Florida, Appellants,
v.
TM FLORIDA-OHIO REALTY LTD. PARTNERSHIP, an Ohio Limited Partnership, Authorized and Doing Business in Florida, Appellee.
No. 88-00914.
District Court of Appeal of Florida, Second District.
July 21, 1989.
On Motion for Rehearing, Rehearing and Certification December 15, 1989.
*1204 Susan H. Churuti, County Atty., and Robert E.V. Kelley, Jr., Asst. County Atty., Clearwater, for appellants.
Kent G. Whittemore of Whittemore & Ramsberger, P.A., St. Petersburg, for appellee.
On Motion for Rehearing, Rehearing En Banc and Certification December 15, 1989.
LEHAN, Acting Chief Judge.
The Property Appraiser of Pinellas County contends on appeal that the trial court was without authority to enter its final judgment reducing the property appraiser's assessment of the value of property leased for a shopping center.[1] The basic argument for reversal of the final judgment appears to be that a property appraiser's assessment is presumed to be correct, that section 193.011, Florida Statutes (1985) requires only a property appraiser's consideration of various specified factors affecting the value of property, including its income which in this case is rental income at a level below that obtainable on the current market, and that the evidence established that the property appraiser considered all of those factors.
We affirm. There was substantial competent evidence that the property appraiser, by not actually using the rental income *1205 as a factor weighed in arriving at his assessment, assessed the property at a figure in excess of its fair market value. He therefore did not give proper consideration to the income factor specified in section 193.011, as did in effect the trial court in arriving at its reduced assessment.
Our analysis will begin by summarizing in section (1) of this opinion basic facts of this case and reasons under pertinent case law why the final judgment must be affirmed. The remaining sections will then: (2) explain the evidence supporting the trial court's result, notwithstanding its orally indicated reasoning, and (3) analyze how prior Florida case law which is relied upon by the property appraiser or the dissenting opinion, or both, is materially distinguishable or is authority for this affirmance.
The analysis in section (3) is intended to be in some depth to dispel any question that our holding conflicts with prior Florida case law. This is notwithstanding the facial appearances of cases discussed in that section which, in materially different contexts not emphasized in those cases, approved property appraisers' assessments arrived at without the use of the income factor. For reasons explained in section (3), the income from the leases involved in or referred to in those cases was, in contrast to the income from the lease involved in this case, not shown to have affected the fair market value of the leased property.
Because the relationships between some of the different aspects of the subject matter of section (3) are fairly intricate, the analysis in section (3) is in some respects fairly intricate. But we will first, in sections (1) and (2), undertake to show fairly simply the fundamental reasons why we conclude that the result in the trial court was correct.
Much of the Florida case law in this area does not address squarely, and fully explain, the basic issues involved, which doubtless explains the trial court in this case not having put its finger precisely upon the right reason for its right result. Cases in this area should receive analyses centered upon factors governing the "just" valuation of property, as required by section 193.011 and article VII, section 4 of the Florida Constitution which call for fairness to taxpayers, as well as, and not only, addressing how increases in tax assessments may be justified under general legal principles. That is the kind of analysis undertaken in this opinion.

(1) Summary of Facts and Reasons Under Pertinent Case Law Why the Final Judgment Must Be Affirmed.

The final judgment declared null and void the portion of the property appraiser's assessment of appellee's shopping center property which exceeded $2,950,000. The property appraiser had assessed the property at $3,981,400. As noted above, in arriving at his assessment he had not used in any way the factor of the income receivable by appellee under the lease to which the property is subject,[2] as did in effect the trial court.
What the trial court did not do, as well as what it did, should be recognized. Previous to the property appraiser's assessment in issue in this case, the property had been assessed at $2,105,400. Thus, the trial court did not prevent, but approved the imposition of, an increased assessment. The trial court approved an increase in that previous assessment by $844,600, i.e., by *1206 40.1 percent. The property appraiser's increase was reduced by the trial court in such an amount that the assessment did not exceed the fair market value of the property. Also, the trial court, by adopting the reduced assessment figure testified to by appellee's expert, did not base the amount of the reduced increase only upon the income approach to property assessment through using the income factor but, as further explained in section (2) below, used a combination of factors, including primarily income, provided for under section 193.011. This was in contrast to the property appraiser's assessment which, by using only the replacement cost factor, increased the previous assessment by 89.1 percent to a level which was over one million dollars in excess of the property's fair market value.
Our conclusion that the property appraiser did not give proper consideration to the income factor is, as we have said, based upon his having assessed the property in excess of its fair market value as a result of not having used that factor, as did in effect the trial court in arriving at its reduced assessment. We will now explain that basis for that conclusion which requires that we find invalid the property appraiser's assessment and uphold the trial court's reduced assessment.

(a) Basic Reasons Why the Property Appraiser's Assessment Was Invalid and the Trial Court's Reduced Assessment Must Be Upheld.

(i) The Property Appraiser's Assessment Was Invalid Because It Exceeded Fair Market Value.
It appears clear that the property appraiser's $3,981,400 assessment exceeded the property's fair market value. Appellee's expert testified that the fair market value of the property was $2,950,000, and the property appraiser acknowledges that his own assessment appears to have exceeded fair market value. A tax assessment of real property must not exceed the property's fair market value. See Valencia Center, Inc. v. Bystrom, 543 So.2d 214 (Fla. 1989) (hereafter "Valencia Center III"); Walter v. Schuler, 176 So.2d 81, 85-86 (Fla. 1965).[3] Therefore it appears established that the property appraiser's assessment was invalid.

(ii) The Trial Court's Reduced Assessment Must be Upheld Because Under the Circumstances of this Case Use of the Income Factor Produced, and Was Necessary to Produce, Fair Market Value.
While the fact that the property appraiser's $3,981,400 assessment exceeded fair market value establishes that his assessment was wrong, that in itself does not establish that the trial court's $2,950,000 reduced assessment corresponded to the property's fair market value and therefore was right. While the property appraiser acknowledges that his assessment appears to have exceeded fair market value, he has not acknowledged that the trial court's reduced assessment corresponded to the property's fair market value.
To show why we uphold the trial court's reduced assessment figure under these circumstances, we need only examine and find valid the method used by appellee's expert to arrive at that figure. That method was to use principally the income factor. In examining that method, as we do below, we will, at the same time, necessarily examine and find invalid the method used by the property appraiser in arriving at his assessment, which was unnecessary to do in (i) above due to the property appraiser's acknowledgement that his assessment appears *1207 to have exceeded fair market value. Accordingly, in showing the reasons for our affirmance, we need only show, as is done below, that a proper assessment, i.e., a fair market value figure, under the particular circumstances of this case not only did not result from the property appraiser's assessment method, but cannot have resulted unless the assessment method used the income factor, as did that of appellee's expert. That is the crux of this case.
The property is subject to a long-term lease for a K-Mart store which yields rental income which is "submarket," i.e., less than that obtainable from a lease negotiated on the current market. (The term "long-term lease," as used in this opinion, means, in contrast to the meaning of that term as used in other opinions discussed in section (3) below, a lease which is not to expire until many years after the date of the assessment in issue; that a lease prior to that date may have run for a long term, as did the lease involved in those other opinions, is irrelevant for the purpose of determining the effect of the lease upon the leased property's assessed value.) Since at the time of the assessment the lease had a remaining term, with extensions, of twenty-six years, its submarket rent could not be renegotiated and raised for twenty-six years. The level of the rental income resulted in a reduction of the property's fair market value because, since that level was submarket and could not be renegotiated for twenty-six years after the date of the assessment, a willing purchaser of the property on that date would have reduced his offering price on account of the lease. The longer property is locked into a lease calling for submarket rent, the longer the owner of the property must wait to receive from a willing buyer a price for the property not reduced by the submarket rent.
How short the term of a submarket rent lease of property should be after the date of a tax assessment in order to permit the proper disregard of the rental income from the lease in arriving at the assessment can be considered to be a question of fact, to be determined on a case-by-case basis, as to whether a willing buyer would disregard a particular lease in buying the property for its highest and best use. The uncontroverted  and, indeed, seemingly uncontrovertible  evidence in this case was that a willing buyer would not have disregarded the lease.

(b) Further Grounds Under the Law for Our Affirmance.
By substantially exceeding fair market value and for other related reasons under the evidence as described in section (2) below, the property appraiser's assessment contravened the further requirement contained in Valencia Center III that an assessment be within the range of reasonable appraisals. In fact, the trial court found that the level of the assessment "shocks the conscience of the court" and is "unconscionable."
When, as in this case for the reasons we have explained, the presumption of correctness of a property appraiser's assessment which had failed to take the income approach into account has been rebutted, a trial court is justified in overturning the assessment. See Schultz v. Lurie, 512 So.2d 1003 (Fla. 2d DCA 1987), rev. denied, 520 So.2d 586 (1988). Compare Daniel v. Canterbury Towers, Inc., 462 So.2d 497, 500 (Fla. 2d DCA 1984) (trial court not justified in overturning property appraiser's assessment on basis of appraiser's failure to take income approach into account where that approach was inappropriate due to "complications caused by attempting to accurately predict any stability in the income ... over the years... ."). We do not agree with the property appraiser's argument, for which Blake v. Xerox, 447 So.2d 1348 (Fla. 1984) is cited, that a reasonable hypothesis for the property appraiser's assessment calls for a reversal. For reasons including those explained above, we conclude there was no such hypothesis.
Palm Corp. v. Homer, 261 So.2d 822 (Fla. 1972), provides emphatic support for our affirmance. That case affirmed a trial court's ruling reducing a tax assessment of a shopping center because the assessor's failure to use the income approach was not *1208 excused by the refusal of the shopping center owner to produce income data. The requirement that the income approach be used even under those circumstances emphasizes the importance of using that approach when to disregard it would result in a higher valuation. That is, a particular significance of Palm Corp. v. Homer for present purposes lies in its requirement that the income approach be used even though there had been, as Justice Ervin's dissent stressed, 261 So.2d at 824-26, a seemingly valid reason not to use it. As the supreme court said in that case concerning income, "This is a factor which is particularly applicable to business properties such as shopping centers...." Id. at 823. Also notable relative to the case at hand is that the District Court of Appeal's reversal, which the supreme court quashed in that case, had been grounded upon the presumption of correctness of the assessment and the principle that "such assessments must be overcome by appropriate and sufficient allegations and proof which exclude every reasonable hypothesis of a legal assessment." Homer v. Palm Corp., 243 So.2d 641 (Fla. 3d DCA 1971), quashed, 261 So.2d 822 (1972). That presumption and principle, relied upon by the dissenting opinion and by the property appraiser in this case, also do not require a reversal here. See also Bystrom v. Hotelerama Associates, Ltd., 431 So.2d 176 (Fla. 3d DCA), rev. denied, 441 So.2d 631 (1983); Bystrom v. Equitable Life Assurance Society, 416 So.2d 1133, 1138 (Fla. 3d DCA 1982), rev. denied, 429 So.2d 5 (1983) ("As substantive evidence, the actual income of the [shopping center-hotel complex] property is clearly relevant in reaching a valuation that conforms to [fair market value, i.e., to] the willing buyer-willing seller concept."); Exchange Realty Corp. v. Hillsborough County, 272 So.2d 534, 536 (Fla. 2d DCA 1972) ("In ... Palm Corporation v. Homer ... our Supreme Court held that the failure by the assessor to use the criterion of income did not satisfy legal requirements and, therefore, was not a proper assessment.").
Palm Corp. v. Homer is also specific authority for our foregoing conclusion that the failure of the property appraiser to use in any way the income factor in this context was a failure to properly consider that factor as required by section 193.011. The opinion in that case notes that a tax assessor's failure to "apply" and to "use[]" the income factor was contrary to the requirement of section 193.011 that that factor be "considered." 261 So.2d at 823. See also Walter v. Schuler, 176 So.2d at 85 ("Sec. 193.021 [the predecessor to section 193.011] was not intended to give assessors an almost unbridled discretion in the performance of their duty to establish just valuation. Rather, we regard the Act as an attempt by the legislature to pin the assessors more firmly to the Constitutional mandate [of just valuation].").
The requirement of Palm Corp. v. Homer that the income approach be used in an assessment of property like that in this case is, of course, complementary to the requirement of Valencia Center III and Walter v. Schuler that an assessment not exceed fair market value. That is, as explained above, the income approach to the valuation of property like that involved here could not be disregarded without also disregarding the fair market value requirement.
We therefore conclude that an affirmance is required by pertinent Florida case law. There is case law to the contrary in other jurisdictions, but the apparent majority view is consistent with our view that submarket rental income from a long-term lease on real property should be weighed in arriving at a proper valuation of the property for ad valorem tax purposes. See Annotation, Income or Rental Value as a Factor in Evaluation of Real Property for Purposes of Taxation, 96 A.L.R.2d 666, 700-02 (1964).
The position of the Michigan Supreme Court in C.A.F. Investment Co. v. Township of Saginaw, 410 Mich. 428, 302 N.W.2d 164 (1981), is representative of cases from other jurisdictions consistent with our affirmance. Not only did C.A.F. Investment require the weighing of the income approach for the valuation of shopping center property, as did Palm Corp. v. *1209 Homer, but C.A.F. Investment also specifically required such weighing of rental income like that in this case, i.e., income from a long-term lease for a K-Mart store calling for rent less than that obtainable on the current market. In that case, which involved a remaining lease term of nineteen years, the Michigan Supreme Court disapproved disregarding the actual rental income and substituting therefor consideration of the amount of rent which could be obtained on the current market. The court said:
To the extent that the tax commission permitted actual income to be ignored, the ... valuation was clearly in error.
... .
[T]rue cash value must equal the fair market value of the property to the owner... . [T]o equate economic income with hypothetical income [a rental income figure chosen by tax assessment authorities to represent prevailing market rent] in every situation where actual rent under a long-term lease is less than the prevailing market rental would be to ignore the effect of the lease on a prospective investor's judgment regarding the fair market value of the property.
410 Mich. at 449-450, 302 N.W.2d at 167, 171.[4] And in Townsend v. Town of Middlebury, 134 Vt. 438, 440, 365 A.2d 515, 517 (1976), the Vermont Supreme Court, in deciding that a valuation of commercial property should give weight to income received under a renewable, long-term lease and purchase option on the property, said: "It is obvious that the presence of a lease/option agreement concerning a parcel of property is an element which enters into giving a saleable or market value to the property."
Folsom v. County of Spokane, 106 Wash.2d 760, 725 P.2d 987 (1986), appeal after remand, 111 Wash.2d 256, 759 P.2d 1196 (1988), is further representative of cases consistent with an affirmance. That case involved the valuation of shopping center property subject to a lease for a K-Mart store calling for rent less than that obtainable on the current market for a potential remaining lease term of fifteen years. The Washington Supreme Court, in an in-depth analysis, unequivocally required the use of the income approach to the valuation of the property through the weighing of the actual rental income to be received by the property owner under the lease. The fundamental basis was the Washington requirement, like that in Florida, that the assessed value of the property must be its fair market value. As the Washington court said in that regard,
[A] purchaser clearly would be unwilling to pay the capitalized value of fair market rent for property, such as the Owners', encumbered by a long-term lease at below-market rates. To disregard this lease "would be to disregard a factor which plainly would affect the price negotiations between a willing buyer and a willing seller." Duwamish Warehouse Co. v. Hoppe, 102 Wash.2d 249, 256, 684 P.2d 703 (1984). As stated in Duwamish, such a "result is a nonuniform valuation much higher than the true and fair market value in money which the statute commands."
106 Wash.2d at 769, 725 P.2d at 992. The Washington court's rationale was further explained as follows:
Even if a disadvantageous lease can be attributed to imprudence, the property's value must reflect what a willing buyer would pay; a willing buyer would not pay full market value for property burdened by a long-term lease at below-market rates.

*1210 Furthermore, [any argument that the property owner should bear, through a tax assessment based upon market rent, the onus of actually receiving less than market rent under an existing lease on the property] does not satisfactorily account for discrepancies between lower contract rates set with prudence under past market conditions and higher fair market rates resulting from subsequent inflation and changed business conditions. Such discrepancies frequently arise in connection with the leasing of shopping center space to large national tenants, as such tenants frequently demand long-term gross leases, without escalation clauses, and many times at discounted rates. These anchor tenants in turn attract smaller tenants and other satellite shopping areas in close proximity. These subsequent commercial leases in the surrounding area may be predicated on favorable economic conditions largely resulting from the effort and capital expenditure of the original lessor.
As the fair market value of the areas's commercial space rises, property assessors will increase their assessments accordingly. Nevertheless, the original lessor will be bound by the terms of his now below-market lease, facing the prospect of a fixed income in a climate of rising taxes. Failure to take notice of his plight would unduly penalize the entrepreneur whose efforts have created the business environment from which communities derive greater property tax revenues.
Id. at 768, 725 P.2d at 991 (citation omitted).
Also particularly on point is Ancel, Determining Fair Market Value of a Shopping Center for Purposes of Property Tax Assessment, 1965 U.Ill.L.F. 253. The following excerpts from that article illustrate its consistency with our affirmance:
In order for the assessor to find the market value of a [shopping] center, ... capitalization of net rental income should be the controlling, if not the exclusive, basis of valuation.
Id. at 254.
Certainly in terms of the market place, as expressed in the reported cases involving valuation of an entire [shopping] center, the item determining value will be the capitalized net income from rentals.
Id. at 255.
In short, capitalization of net income from rentals should be relied upon because the earning potential of property is the most accurate indication of its market value. In those instances where the courts have not followed the income approach, either there has not been enough data available to obtain an accurate picture of the value of the property in question by use of the income approach [see Canterbury Towers, supra], or the capitalization has resulted in a value exceeding that based upon replacement.
Id. at 256-57 (footnotes omitted).
The income approach ... has a particular application to the shopping center situation.
Id. at 257.
Because the assessor in most taxing jurisdictions is required ... to find the fair market value of property ... and because there are few if any sales of comparable [shopping] centers, and because the replacement cost is meaningless in the market place, text writers and reasoned court opinions support measurement of the market value by means of the income approach. Under such circumstance, the assessor should also use the income approach to value.
Id. at 262.
See also, e.g., Board of Supervisors of Fairfax County v. Nassif, 223 Va. 400, 290 S.E.2d 822 (1982), appeal after remand, 231 Va. 472, 345 S.E.2d 520 (1986); Brickman v. Manchester, 119 N.H. 919, 409 A.2d 1328 (1979); Merrick Holding Corp. v. Board of Assessors of Nassau County, 45 N.Y.2d 538, 410 N.Y.S.2d 565, 382 N.E.2d 1341 (1978); State ex rel. Park Plaza Shopping Center, Inc. v. Board of Review, 61 Wis.2d 469, 213 N.W.2d 27 (1973); F.W. Woolworth Co. v. Comm'n of Taxation & Assessment, 26 A.D.2d 759, 272 N.Y.S.2d 257 (N.Y. App. Div. 1966); McCrory Stores Corp. v. City of Asbury *1211 Park, 89 N.J. Super. 234, 214 A.2d 526 (N.J. Super.Ct.App.Div. 1965).

(2) The Final Judgment Should be Affirmed on the Basis of Substantial Evidence Supporting the Trial Court's Result, Notwithstanding Its Orally Indicated Reasoning.

A basis orally indicated by the trial court in this case for determining that the property appraiser's total rejection of the income approach was not justified was that the property appraiser had not rejected that approach for many years in the past, thus lulling the property owner into having leased the property for a long term at a rental which had not, of course, taken into account taxes based upon the new assessment. In that regard the property appraiser (with which the dissenting opinion appears to agree), citing State Dept. of Revenue v. Anderson, 403 So.2d 397 (Fla. 1981), argues that the trial court applied estoppel against the property appraiser which was improper because estoppel cannot so apply absent exceptional circumstances which did not exist here.
While the trial court's oral statements that the amount of the increased assessment is "unconscionable" and "shocks the conscience of the court" might be taken to be a finding that there were such exceptional circumstances, the court did not say that estoppel applied. In fact, the court said estoppel "almost" applied. In any event, it is not necessary to address whether estoppel could and did apply. Suffice it to say that the trial court did not lack a basis from the law and the evidence to conclude under the circumstances of this case that the income approach should have received at least some application and that "submarket rent" was not a valid foundation for totally rejecting that approach, as the property appraiser acknowledges he did. The basis from the law is represented by Palm Corp. v. Homer, Valencia Center III, and Walter v. Schuler, as discussed in section (1) above. The basis from the evidence was the below-described expert testimony on appellee's behalf to which brief reference has been made in section (1).
Appellee's expert testimony specifically dealt with each of the factors to be considered under section 193.011. In arriving at a valuation, that testimony employed a combination of what were characterized as the main approaches generally used in real property appraisals  "sales comparison," "cost," and "income," with emphasis upon income. The $2,950,000 valuation placed upon the property by the trial court was the figure testified to by that expert to be the property's fair market value. The testimony of appellee's expert reflected that no purchaser of the property would, in deciding upon the price he would pay, ignore the submarket rentals to be received under the long-term lease to which the property is subject.
Furthermore, there was before the trial court testimony of appellee's expert which can be taken to have been to the effect that no appraisal of the property involved in this case using proper methodology would fail to apply an allowance for the submarket rental income under the long-term lease, as the property appraiser's assessment failed to do. In addition and against the background of the above-described testimony, that expert testimony can be taken to have provided grounds stated in Florida East Coast Railway Co. v. Green, 178 So.2d 355, 360-61 (Fla. 1st DCA 1965), quoting Louisville & N. Railroad Co. v. Amos, 98 Fla. 350, 123 So. 745 (1929), for invalidating a property assessment, i.e., that the property appraiser's assessment was "arbitrary" (using, as the expert did, a definition of "arbitrary" as being without a substantial basis), as well as without "practical regard to existing conditions and circumstances."
In his reply brief the property appraiser, as indicated above, acknowledged that it appears that the amount of his assessment exceeded present cash value, i.e., fair market value.[5] The reason why his assessment *1212 exceeded fair market value lies not only in the approach based upon the income factor he did not use but in the only approach he did use in arriving at his assessment, the cost approach. Ancel, supra at 262, characterizes cost as an approach to the valuation of shopping center property which is "meaningless in the market place" (presumably if it is the only approach used). The cost approach was the primary basis for the tax assessor's assessment in Palm Corp. v. Homer which, as is pointed out above, was overturned because the income approach had not been used. 261 So.2d at 823. The dissenting opinion states that the property appraiser simply "weighed the cost factor most heavily." Any inference from that statement that in arriving at his assessment the property appraiser used any factor other than cost would be erroneous.
That, as the property appraiser and the dissenting opinion point out, the trial court incongruously commented at the hearing that the property appraiser's method of appraisal was not "erroneous or improper" and that the trial court found "no problem" with the property appraiser's methodology is not at all determinative. See Chase v. Cowart, 102 So.2d 147, 150 (Fla. 1958) (result in trial court must be affirmed if right, even if right for wrong reason). Nor under all the circumstances does it seem that those comments should be taken to have the meaning which their words appear to reflect. The court might have been referring only to the application of the method which the property appraiser did use or might have been indicating evolving thought processes. Because the court's adjustment to the property appraiser's assessment increase was based upon the testimony of appellee's expert which gave substantial application to the income approach, the final judgment did not mean the property appraiser had used proper methodology in giving no application to that approach.

(3) The Case Law Relied Upon by the Property Appraiser and By the Dissenting Opinion Is Materially Distinguishable or Is Authority for This Affirmance.

For the reasons explained in this section, none of the cases relied upon by the dissenting opinion and by the property appraiser is shown to be factually in point. While the dissenting opinion characterizes Century Village v. Walker, 449 So.2d 378 (Fla. 4th DCA), rev. denied, 458 So.2d 271 (Fla. 1984), as being "strikingly similar to the instant matter," we conclude that that case, in significant contrast to this case, is not shown to have involved a long-term lease and, for the reasons indicated above and further explained below, cannot have soundly reached the result it did unless it involved a short-term lease.
Also, neither the dissenting opinion nor the property appraiser refers to Bystrom v. Valencia Center, Inc., 432 So.2d 108 (Fla. 3d DCA 1983), rev. denied, 444 So.2d 418 (1984) (hereafter Valencia Center I"), and the dissenting opinion does not refer to Valencia Center, Inc. v. Bystrom, 526 So.2d 707 (Fla. 3d DCA 1988) (which was affirmed by Valencia Center III and is called hereafter "Valencia Center II"). Valencia Center I and Valencia Center II are highly relevant to an analysis of Florida law in this area. Valencia Center I was principal authority for Century Village, upon which the dissenting opinion and the property appraiser principally rely, and illustrates, as we will explain, why not only Valencia Center I, but also Century Village, *1213 are materially distinguishable from the case now before us. Valencia Center II dealt, as did Valencia Center III in a different way, with the statute enacted in 1986 by the Florida legislature to reverse the results in Valencia Center I and Century Village, thereby illustrating Florida legislative intent to call for an affirmance in this case, as we will explain.
The property appraiser and the dissenting opinion cite Century Village for the position that the existence of the submarket rent from the long-term lease of the property was a proper reason for the property appraiser to reject the income approach and not take into account rentals receivable under the lease. (The dissenting opinion's endorsement in this case of using for the assessment the combined values of both the lessor's and the lessee's interests is in effect an endorsement of rejecting the income approach. The reason is that that would effectively eliminate from the valuation of the property the lowering effect of the submarket rental income upon the value of the lessor's interest because that lowering effect would be offset by adding to the valuation the increased value of the lessee's interest resulting from submarket rental expense.) We do not agree. The narrow holding of Century Village in response to the property owner's contention on appeal was that the income approach based upon actual, submarket rental income may not be the only basis for the valuation of leased property for which submarket rent is being received. 449 So.2d at 379. With that we do not disagree. And, as the trial court in this case noted, Century Village quotes Dept. of Revenue v. Morganwoods Greentree, Inc., 341 So.2d 756, 758 (Fla. 1977), for the proposition that the existence of an encumbrance (a term used in Century Village to include a lease) is a factor to be considered in the valuation of property. 449 So.2d at 381.
The property appraiser's position, which relies upon other language in Century Village and Morganwoods Greentree, and the position of the dissenting opinion which discusses Century Village but does not discuss Morganwoods Greentree, are, stated in another way, each to the effect that property which is subject to a submarket-rent lease may be valued as though there were no lease.[6] While there is language to that effect in Century Village and Morganwoods Greentree, none of the leases involved in Century Village, in contrast to the lease in this case, was shown to have been a long-term lease (and it may be concluded that none was a long-term lease[7]), nor was such a lease involved in Morganwoods Greentree. Thus, as will be further explained in the succeeding paragraphs, we do not conclude that that language calls for a reversal of the final judgment in this case. And, Morganwoods Greentree is authority for our affirmance, as will also be further explained.
*1214 The submarket rents involved in Century Village under leases which were not shown to be long term, in contrast to the submarket rent in this case, could presumably have been renegotiated upward within a relatively short time to take into account, and shift to the lessees, the burden of the increased taxes. There would thus have been no unfairness to the property owner in that case like that from the property appraiser's assessment in this case, and the fair market value of the property in that case can be taken to have been unaffected by the submarket rents. Accordingly, it is going too far, as the property appraiser has done here, to take the position that under Century Village it is proper to not at all use the income approach for the valuation of property subject to a lease calling for submarket rent regardless of the length of the lease. In any event, that is going too far in our view for such property with a lease the length of that in this case. This is not to take issue with, because it is unnecessary to address, that position as to property under short-term leases, as we conclude was the property in Century Village. See footnote 10 infra.
Morganwoods Greentree did not involve a lease. It involved the assessed value of a common area within a townhouse complex. It is relied upon by the property appraiser in this case (as well as by Century Village) but actually may be taken to support our affirmance. Because its real import in that regard may well not be immediately apparent from a quick reading of the opinion and is actually obscured by reliance upon only part of its language, as does the property appraiser in this case, we will undertake to fully explain that case.
The common area in Morganwoods Greentree was owned by a corporation which, pursuant to a declaration, was entitled to assess against the surrounding townhouse properties maintenance costs, including taxes, of the common area. The common area was subject to encumbrances, such as that of easements of ingress and egress owned by the townhouse owners. The supreme court's opinion in that case specifically notes that it does not authorize "an assessment ... without regard to the effect of an encumbrance on the value of the land. The encumbrance becomes one factor among many the assessor must consider in determining the just value of the property to be taxed." 341 So.2d at 758. While that opinion also states as dictum "the general rule" of assessing the value of leased property as though there were no lease, that statement is then qualified by the further statement that the existence of an encumbrance will not "per se" reduce the amount of the assessment and by the above-quoted statement that there may be no assessment of encumbered land without regard to the effect of the encumbrance on the land's value. Id. The general rule to which reference was made no doubt applies to leases calling for market rent, as contrasted with the submarket rent involved in this case, which presumably is provided for in most leases and the encumbrance of which would not depress the fair market value of the property. See footnote 10 infra.
The holding of the Morganwoods Greentree opinion appears to call for including the value of the encumbrances on the common area in the valuation of the townhouses and reducing the valuation of the common area by that value of the encumbrances so that the total assessed value of the common area and the townhouses will equal the total value of the entire project. But the opinion also notes (as a seeming paradox but apparently referring to the extent to which the common area might nonetheless be valued as though there were no encumbrances against it) that the owner of the common area could shift to the townhouse owners the burden of the taxes on the common area.
Accordingly, Morganwoods Greentree involved the apportionment of taxes among various taxpaying property owners and also how the burden of the taxes imposed upon one of them could be shifted to the others. In either respect that case supports our affirmance. To the extent it authorizes reducing the valuation of the common area due to encumbrances, that is the effect of the final judgment in this case which reduced the property appraiser's valuation *1215 of long-term leased property due to submarket rent which had not been taken into account in that valuation. To the extent it indicates that no unfairness would result from valuing the common area without regard to the encumbrances, it points up the distinction between that case and Century Village, which, as we have said, is not shown to have involved long-term leases (as well as the below-described opinion in Valencia Center I), on the one hand, and this case, on the other. That is, the situations in those cases appear in contrast to that in this case in which the appellee cannot shift the burden of the increased property taxes to the holder of the encumbrance against the property, i.e., to the submarket-rent lessee who benefits for many years from the underlying cause of the increased taxes.[8] Accomplishing fairness was the clear objective of Morganwoods Greentree through the balancing of the interests of the various taxpayers involved as well as those of government.[9]
Thus, Morganwoods Greentree points up particular reasons for weighing the income approach in the valuation of property which is subject to a lease calling for submarket rent. (And, even if those reasons did not exist, Palm Corp. v. Homer, as explained above, appears to call for the use of the income approach in the valuation of property like that in this case  a shopping center  whether or not the rental income from the property is submarket. However, the rentals considered in Palm Corp. v. Homer may well have been submarket, the valuation in that case having been lowered through use of the income approach.)
Regarding the property appraiser's position that property which is subject to a submarket rent lease may be valued as though there were no lease, the property appraiser and the dissenting opinion also call attention to a statement by the appellee's expert that the property appraiser's assessment would not be excessive if the law requires assessments to reflect the value of the unencumbered fee. However, that statement is not significant under our view that the law does not call for that method of appraisal in this case but calls for taking into account the encumbrance represented by the long-term, submarket-rent lease, as well as other factors, as did appellee's expert.
Valencia Center I, upon which Century Village relies, does not call for valuing as though there were no lease property which is subject to a long-term lease calling for submarket rent like the lease in this case. Valencia Center I does concern the valuation of property subject to a lease calling for submarket rent and approves an assessment without the use of the income approach. But that case, in contrast to this case, was shown to have involved a lease *1216 extending no more than "several years into the future," 432 So.2d at 110 (and also the property appraiser's assessment which Valencia Center I upheld was only 14.7 percent above the assessment fixed by the Property Appraisal Adjustment Board which the trial court in that case had approved, id. at 109). Thus, in Valencia Center I, as, we conclude, in Century Village, and in contrast to the case at hand, the burden of taxes based upon an assessed valuation of property without reduction by reason of its being encumbered by a submarket-rent lease apparently could, within a relatively short period of time, have been shifted to the party receiving the benefit of the encumbrance. See also Morganwoods Greentree. On the same basis the submarket rents in Valencia Center I can be taken to have not affected fair market value.
None of the cases cited in Valencia Center I for the proposition that the assessed valuation in that case must be of the property as though there were no lease, 432 So.2d at 111, involved the consideration of income, much less submarket rental income, from a long-term lease, i.e., a lease having a term shown not to expire until many years after the valuation. Also, all of those cited cases antedated Morganwoods Greentree. Carried to its logical end, the position of the property appraiser and the dissenting opinion in this case would, if valid, justify assessing as though unencumbered property which is subject to a submarket rent lease having a remaining term of 100 years, even though the fair market value of the property could not rise to the level of that assessment for another century. The dissenting opinion of Judge Beranek in Century Village, citing Morganwoods Greentree, did not agree with Valencia Center I that even the lease in that case could be ignored in valuing the property. 449 So.2d at 382.[10]
The provision in section 193.011(2) requiring the consideration of "[t]he highest and best use to which the property can be expected to be put in the immediate future" further indicates the material difference between a case involving a long-term lease like that here and cases involving short-term leases. That is, to value property subject to a short-term lease as though there were no lease may be argued to properly take into consideration the forthcoming expiration of the lease and thereby the use to which the property can be put in the at least relatively immediate future. But to value the property in this case as though it were not encumbered by a long-term lease would seem to contravene that statutory provision by basing the property's value upon its potential use at a time in the future which could not even arguably be "immediate." That the requirement of section 193.011(2) was totally discounted in Valencia Center I with respect to the effect of the lease on the property, 432 So.2d at 110-11, may be taken to support this point and to further illustrate the material distinction between Valencia Center I and this case.
Our conclusion that the property appraiser's failure to use the income approach was not consistent with section 193.011 is borne out by the legislative intent evidenced in *1217 the 1986 enactment of a much more specific provision in section 193.023(6). Section 193.023(6) provides:
In making his assessment of improved property which is subject to a lease entered into prior to 1965 in an arm's length, legally binding transaction, not designed to avoid ad valorem taxation, and which has been determined by the courts of this state to restrict the use of the property, the property appraiser shall assess the property on the basis of the highest and best use permitted by the lease and not on the basis of a use not permitted by the lease or of income which could be derived from a use not permitted by the lease.
Section 193.023(6) is not applicable to this case since the lease involved here was entered into after 1965,[11] and, in any event, that section was held unconstitutional in Valencia Center II which was affirmed by Valencia Center III. Nonetheless, section 193.023(6) does evidence legislative intent contrary to the results in Century Village and Valencia Center I which, as we will explain, is relevant to this case. See Valencia Center II, 526 So.2d at 708 ("It is undisputed that the new statute effectively overrules our holding in the earlier case."); 51 Fla.Jur.2d Taxation § 17:416 (Supp. 1989) ("The amendment is obviously intended to reverse Century Village v. Walker ... and Bystrom v. Valencia Center, Inc. ...").
Valencia Center II held section 193.023(6) unconstitutional on the stated basis that that section "fixes an assessed value below the fair market value because use of the property is restricted by terms of a lease," 526 So.2d at 708. The rationale was apparently that section 193.023(6) improperly so "fixes" an assessed value less than fair market value because it calls for using only the income approach to the valuation of property which, like that in the Valencia Center cases, is subject to a lease calling for submarket rent. Although section 193.023(6) does not in terms refer to the required use of the income approach, it appears to require that approach by requiring that the assessment be based upon "the highest and best use permitted by the lease." (The above-quoted, stated basis for the holding in that case does not appear to have taken into consideration the fact that a lease's restriction of the use of property does not necessarily mean that using the income approach to the valuation of that property would result in a valuation below fair market value; see footnote 10 of this opinion as to leases calling for market and over-market rent.) The Valencia Center II holding does not require a result different from that which we would reach in this case and, in fact, supports an affirmance for a number of reasons:
First, the trial court in this case did not, as would be required by section 193.023(6), arrive at an adjusted valuation of the property only based upon the income approach. As pointed out above, the income approach which took into account in this case submarket rent was not the only approach used by appellee's expert. All section 193.011 factors were considered, and the income approach was among several approaches used in the valuation adopted by the trial court. Second, the trial court's adjusted valuation in this case, in contrast to Valencia Center II's perception of the effect of section 193.023(6), is not shown to have been in an amount less than the property's fair market value. In fact, appellee's expert, as we have said, testified that the $2,950,000 adjusted valuation figure was the property's fair market value.
Third, as pointed out above  and as Valencia Center II pointed out  the legislature evidenced its intent in enacting section 193.011 to have been contrary to the result in Valencia Center I. The legislative intent was thereby shown to have been that the income approach should be weighed in the valuation of property subject to a lease and should not be totally excluded in that regard as did Valencia Center I. That is, even though pursuant to Valencia Center II the legislature under section 193.023(6) could not constitutionally have an enforceable *1218 intent that the income approach shall be the only approach to the valuation of property subject to a lease calling for submarket rent, an implicit legislative intent which is constitutional and enforceable was shown by section 193.023(6) to be at least that the income approach should under those circumstances be an approach used. (This intent, which was shown by section 193.023(6) to apply regarding property subject to "a lease," was not limited to property like that in this case which is subject to a long-term lease; that section thus provided after the fact support for Judge Beranek's dissent in Century Village; however, again, we need not and do not take issue in this long-term lease case with the results reached in Valencia Center and Century Village.) Fourth, the above described rationale of Valencia Center II is consistent with the observation further above that we do not disagree with the narrow holding of Century Village that the income approach may not be the only approach used to arrive at a valuation of property which is subject to a lease calling for submarket rent.
That narrow holding of Century Village (which relied upon Valencia Center I) was the same as the above-described rationale for the Valencia Center II holding that section 193.023(6) is unconstitutional. But the Century Village opinion expanded further, as had Valencia Center I, to indicate that the income approach should be totally disregarded, an expansion with which we do not agree under the long-term lease circumstances of this case and with which the legislature at least implicitly disagreed by enacting section 193.023(6) concerning any lease, whether long or short term.
Thus, section 193.023(6), as interpreted by Valencia Center II, went to one extreme (as had the rejected contention of appellant in Century Village), i.e., that the income approach should be the only approach to valuing property subject to a lease calling for submarket rent, and Valencia Center I and Century Village went to the other extreme, i.e., that the income approach should be totally disregarded in valuing such property. Our opinion takes the middle ground, as did in effect the trial court's final judgment, i.e., that in valuing property like that in this case the income approach should be one of the approaches. The apparent error of the property appraiser in this long-term lease case was in his going to the extreme represented by Century Village and Valencia Center I which, whether or not valid in those cases, was not in the context of a long-term lease as is this case.
The Florida Supreme Court affirmed Valencia Center II in Valencia Center III. The supreme court affirmed the determination that section 193.023(6) is unconstitutional (although on a different ground) as well as the property appraiser's assessment in that case which, as noted above, had not taken into account the submarket rent lease on the property. Language in Valencia Center III, including citations to and quotations from Xerox and Morganwoods Greentree, are argued by the dissenting opinion to support the arguments in this case of the property appraiser which are addressed above and which, for the reasons explained, we conclude are not controlling under the circumstances of this case. At the heart of those reasons is that Valencia Center III, while involving property subject to a lease calling for submarket rent, as does this case, did not involve a long-term lease, as does this case and as did, e.g., C.A.F. Investment and Folsom. Valencia Center III implicitly recognizes that the lease in that case was not for a long term by stating that the "present" market value of the property properly reflected the potential higher and more valuable use of the property for purposes other than its use under the lease, 543 So.2d at 27 (especially since section 193.011(2) provides that only the "immediate" future use of property may be considered).
That Justice McDonald's dissent in Valencia Center III refers to the "long-term lease," id. at 217, on the Valencia Center property and that the majority opinion in that case refers to the lease as "pre-1965," id. at 216, do not alter our views in this regard. In fact, the Third District Court of Appeal in Valencia Center I had also referred to a "long-term lease." 432 So.2d at *1219 110. As pointed out above, we use the term "long-term lease" to mean, in contrast to the lease in the Valencia Center cases which at its inception had been for a long term but at the time of the tax assessment in issue was to run for only "several years," 432 So.2d at 110, a lease having a term shown not to expire until many years after the property appraiser's assessment of the property.
As explained in section (1) of this opinion, the supreme court's opinion in Valencia Center III calls for our affirmance in this case by stressing, and citing Walter v. Schuler for the proposition, that "the just valuation at which property must be assessed under the constitution and section 193.011 is synonymous with fair market value, i.e., the amount a purchaser, willing but not obliged to buy, would pay a seller who is willing but not obliged to sell." 543 So.2d at 216. As we have also explained, the amount of the property appraiser's assessment in this case far exceeded fair market value by wholly ignoring the aspect of the submarket rent under the long-term lease.
Furthermore, while the dissenting opinion quotes Valencia Center III (which relies upon Xerox) for the proposition that the weight to be given to a particular section 193.011 factor is "left to the discretion of the assessor, and his determination will not be disturbed on review," that proposition is then qualified by the words: "as long as ... the assessed value is within the range of reasonable appraisals." Id. at 217. As we have explained in section (1), as appellee's expert testified (including his uncontradicted testimony that the property appraiser's assessment exceeded fair market value by over one million dollars), and as the trial court in this case can be taken to have in effect found by declaring that the amount of the property appraiser's assessment was "unconscionable" and "shocks the conscience of the court," the property appraiser's assessment here was clearly shown by competent evidence to be not "within the range of reasonable appraisals." Also, that, as Valencia Center III states, a property appraiser need not necessarily "use" in all cases all section 193.011 factors in arriving at his assessment, id., does not derogate from our affirmance for the reasons explained above.
Nor, for the same reasons, should it be concluded that Valencia Center III's reference (referred to in the dissenting opinion and also referred to in Century Village as quoted in the dissenting opinion) to an assessment of the value of "both the lessor's and lessee's interests," id. at 217, so derogates. A failure to include in the amount of an assessment of property leased for submarket rent the value of the lessee's, as well as the lessor's, interest in the property may, as Valencia Center III indicates, result in a valuation below fair market value, but that would be for property which is subject to a lease which is not long term. The reason, again, is that a purchaser of property in that situation (as contrasted with a situation involving a long-term lease) could, in deciding upon his offering price, very well virtually ignore the only temporarily depressing effect of submarket rent upon the value of the property to the property owner. By so doing the purchaser would in effect base his offering price upon the value of the entire unencumbered fee which would presumably be the same as the combined value of the lessor's and the lessee's interests. As the Washington Supreme Court in Folsom pointed out in this regard, "[I]f a disadvantageous lease will expire by its terms within such a short period of time that a willing buyer reasonably can be expected to ignore the short-term burden on the property's income-producing capabilities, the assessor may [ignore the terms of the lease and] rely solely on market rent." 106 Wash.2d at 769, 725 P.2d at 992.
Folsom also refers to adding to the assessed value arrived at through the valuation of the ownership interest pursuant to the income approach a value for the lessee's interest. 106 Wash.2d at 767-769, 725 P.2d at 990, 992. That was to try to avoid running afoul of the concept of evaluating all interests in property in assessing its value for tax purposes, 106 Wash.2d at 770, 725 P.2d at 993, which is the concept involved in Valencia Center III's above-noted reference to an assessment of the value of both the lessor's and *1220 lessee's interests. That concept, which ensures that the assessment is not based only upon valuing the property owner's interest under the income approach, may be taken to have been in effect accommodated in this case through the method used by appellees's expert whose approach to valuation was not limited to the income approach and whose valuation can be taken to have exceeded the valuation which would have resulted from using only that approach. Thus, even if there were thought to be error in this case from the trial court not assigning a separate value to the lessee's interest and adding that value to the adjusted assessment (which we do not view as error), that would appear to be harmless. The trial court's valuation in this case, which followed that of appellee's expert, was consistent with the admonition of the Washington Supreme Court in Folsom that
we do not suggest that the assessor, in applying the income capitalization approach to valuation, is limited to the actual contract rent as the sole measure of valuation. Property valuation is a very complicated, subjective process, and there may be considerations which suggest that the value of the property is greater than the figure generated by capitalizing contract rent.
106 Wash.2d at 769, 725 P.2d at 992.[12]
Our affirmance under the circumstances of this case is, as explained above, not inconsistent with, and is supported by, the majority opinion in Valencia Center III  and is at the same time consistent with the dissenting opinion of Justice McDonald in that case, with which Justices Overton and Kogan concurred, which relied upon Folsom. 543 So.2d at 217.
Finally, contrary to the implicit argument of the property appraiser and the explicit position of the dissenting opinion, we do not conclude from the case law that fairness to a taxpayer is irrelevant. Certainly fair market value must be fair. And as pointed out above, Morganwoods Greentree was aimed at accomplishing fairness. See also Palm Corp. v. Homer; footnote 7 supra. It should therefore be concluded, as we do, that the trial court did not commit reversible error in not permitting the property appraiser to in effect substantially penalize the appellee for many future years for the property producing from a long-term lease rental income less than that which the property appraiser would want to use in arriving at his assessment in this case in which there was substantial, competent evidence that the property appraiser was wrong. See also the last sentence quoted from Folsom in section (1) above, 106 Wash.2d at 768, 725 P.2d at 991 ("Failure to take notice of his plight would *1221 unduly penalize the entrepreneur whose efforts have created the business environment from which communities derive greater property tax revenues."). There is a strong presumption of the validity of an ad valorem tax assessment, Lurie, 512 So.2d at 1004, but section 193.011 and article VII, section 4 of the Florida Constitution require that there be a "just" valuation.
In conclusion, the view could well be taken that if a court, having an evidentiary as well as legal and equitable basis for its ruling like that of the trial court in this case, is powerless to adjust a property appraiser's assessment increase, the courts would be powerless to adjust property appraiser's assessments in virtually all cases, absent clear mathematical error by a property appraiser. We do not conclude that the legislature, in enacting the statutory requisites for property assessments, intended, or the case law allows, giving property appraisers such absolute power.
Contrary to the conclusion which the dissenting opinion attributes to this opinion, we are not at all declaring that, in the words of the dissenting opinion, "a property appraiser must give at least some weight to each of the statutory criteria and build it into the final valuation of property." We are only ascribing error to the property appraiser's failure to use to any extent the income approach to the valuation of property under the circumstances of this case.
The dissenting opinion gives as a rationale for not judicially reviewing property appraisers' decisions the prevention of an inundation of the courts with suits challenging property assessments. However, under the particular circumstances of this case our affirmance does not countenance any such inundation, and certainly not unless property appraisers inundate the tax rolls with improper assessments in cases like this.
Drawing hard and fast rules to be rigidly applicable under all the varying fact situations in cases in this area of the law is difficult, if not impossible. While great deference must be given to decisions of property appraisers, property appraisers are not entitled to a totally free hand. While the courts have the function of providing a balance against the powers of the executive branch of government of which property appraisers are, of course, a part, courts are not entitled to usurp the functions of property appraisers. In our view, the final judgment strikes a proper balance between those competing interests, comports with legislative intent, and is consistent with all of the relevant Florida case law which has been found.
Affirmed.
FRANK, J., concurring specially.
PARKER, J., dissenting with opinion.
FRANK, Judge, concurring specially.
I write separately to affirm the trial court in this matter. Our limited function is to evaluate whether competent substantial evidence supports the trial court's conclusion. See Blake v. Xerox Corporation, 447 So.2d 1348 (Fla. 1984). From my review of the record, I am persuaded that the property appraiser failed to accord meaningful consideration to each of the criteria enumerated in section 193.011, Florida Statutes (1987). The record discloses an admission that the property appraiser did not "weigh" the income element and relied solely upon the "cost approach" in computing the 1986 assessment. Our supreme court has made plain that the assessor's determination should "not be disturbed on review as long as each factor has been lawfully considered... ." Valencia Center, Inc. v. Bystrom, 543 So.2d 214, 216-217 (Fla. 1989). In my view, the paramount concern, "just valuation," Art. VII, § 4, Fla. Const. (1986), or its equivalent, "fair market value," Walter v. Shuler, 176 So.2d 81 (Fla. 1965), cannot lawfully be reached without giving adequate regard to the income produced by the property. Cassady v. McKinney, 296 So.2d 94 (Fla. 2d DCA 1974); Exchange Realty Corporation v. Hillsborough County, 272 So.2d 534 (Fla. 2d DCA 1972). It is beyond dispute that the "fair market value" and the test by which it is determined, i.e., that which a willing but not obligated purchaser will pay *1222 to a willing but not obligated seller, will be affected by a long-term lease prescribing a legitimate, arm's length sub-market rental.
Thus, in the absence of competent substantial evidence revealing that the "income" criterion was given meaningful consideration, I am convinced the property appraiser's assessment falls short of constitutionally required "just valuation."
PARKER, J., dissenting with opinion.
PARKER, Judge, dissenting.
I respectfully dissent. I commend the majority for attempting to harmonize these cases involving disputes between a taxpayer and property appraiser. However, the previous holdings of our courts do not permit me to join with the majority.
Section 193.011, Florida Statutes (1985), sets forth eight factors that a property appraiser must consider in arriving at a just valuation of property.[1] Section 194.171, Florida Statutes (1985), provides that a taxpayer may bring an action to contest a tax assessment in circuit court. Our supreme court recently addressed the respective roles of the property appraiser and the circuit court when dealing with determinations of just valuation of property. See Valencia Center, Inc. v. Bystrom, 543 So.2d 214 (Fla. 1989). The court stated:
In arriving at fair market value, the assessor must consider, but not necessarily use, each of the factors set out in section 193.011. Oyster Pointe Resort Condominium Ass'n v. Nolte, 524 So.2d 415 (Fla. 1988). The particular method of valuation, and the weight to be given each factor, is left to the discretion of the assessor, and his determination will not be disturbed on review as long as each factor has been lawfully considered and the assessed value is within the range of reasonable appraisals. Blake v. Xerox Corp., 447 So.2d 1348 (Fla. 1984).
Valencia Center, 543 So.2d at 217. In Valencia Center, the supreme court disagreed with the taxpayer's argument that the assessment should be decreased because the property was encumbered by a long-term submarket lease. In considering this argument, the court stated:
As to whether the assessment should be decreased because of the below-market lease to Publix, this issue too has already been addressed by this Court. In Department of Revenue v. Morganwoods Greentree, Inc., 341 So.2d 756, 758 (Fla. 1977), we stated:
We reaffirm the general rule that in the levy of property tax the assessed value of the land must represent all the interests in the land. This means that despite the mortgage, lease, or sublease of the property, the landowner will still be taxed as though he possessed the property in fee simple. The general property tax ignores fragmenting of ownership and seeks payment from only one "owner."
Id.
In an earlier case, the Florida Supreme Court recognized that the method of valuation utilized was within the property appraiser's discretion. See Oyster Pointe Resort Condominium Ass'n v. Nolte, 524 So.2d 415, 417 (Fla. 1988). Further, the property appraiser's valuation is presumptively correct as long as the valuation was determined lawfully; that is, he considered all of the statutory factors. Nolte, 524 So.2d at 417 (citing Blake v. Xerox Corp., 447 So.2d 1348 (Fla. 1984)). The property appraiser, however, is required to use only some of the statutory factors when determining the just valuation of property, *1223 Nolte, 524 So.2d at 418, and may totally reject a factor as long as he has reasonably considered it. Daniel v. Canterbury Towers, Inc., 462 So.2d 497, 501 (Fla. 2d DCA 1984).
A review of the record reflects extensive testimony from the property appraiser's expert (Schultz's expert) relating to the manner by which the final valuation on this property was reached. The property appraiser's office entered into a computer such items as present land unit price and sales information for all commercial properties. Schultz's office also established point structures to update cost numbers, property depreciation, special building features, and the income and expense figures from all commercial properties. Schultz's expert testified that he considered[2] all of the eight criteria outlined in section 193.011 and discussed each criteria as it related to the subject property. He detailed his consideration of the income factor. He testified that he was aware of the lease which encumbered the property and that it provided for a rental amount of $1.84 per square foot before any overage adjustment. He further testified that the market rent for similar properties would range from $4.50 to $6.00 per square foot. Schultz's expert then computed the income value and concluded that the rent received from the property was "submarket"; that is, similar properties were being leased at higher rates. He, therefore, ultimately afforded no weight to the income factor and weighed the cost factor most heavily in order to arrive at a valuation of the taxpayer's unencumbered interest in the property.
The taxpayer's expert agreed that the rent received from the property was submarket and further agreed that Schultz's assessment would not be excessive if the law required assessments to reflect the value of the unencumbered fee interest in the property. Significantly, the taxpayer's expert did not dispute the amount that Schultz's expert attributed to the replacement cost of the building and the value of the land, which were major elements of the cost factor.
Applying the law marked out by the supreme court in both Valencia Center and Nolte and by this court in Canterbury Towers to this appeal, it is evident that the property appraiser complied with his statutory duty by considering all of the statutory factors. It is the taxpayer's burden to prove that the valuation is not supported by any reasonable hypothesis of legality. Nolte, 524 So.2d at 417; Blake v. Xerox Corp., 447 So.2d 1348, 1350 (Fla. 1984); Canterbury Towers, 462 So.2d at 501-02. The taxpayer failed to do that in this case. In fact, in ruling in favor of the taxpayer, the trial court made the following observation:
I find no problem in the methodology by which [the taxing authority] appraised the property in 1986. I'm not saying it is erroneous or improper. That methodology, however, was available to the taxing authority for many years... .
... .
... The property owner was coaxed and lulled into a position of non-anticipation by his reasonable reliance upon proper evaluations [sic]. It is almost a situation of estoppel.
In a case strikingly similar to the instant matter, the fourth district approved a method of assessing the value of a shopping center by combining both the owner/landlord's interest and the tenant's leasehold interest. See Century Village v. Walker, 449 So.2d 378 (Fla. 4th DCA), review denied, 458 So.2d 271 (Fla. 1984). The court stated:
The rule evolving from the foregoing cases has been set forth in the new volumes on taxation in Florida Jurisprudence as follows:

*1224 What interests in property must be valued

Absent special legislation authorizing the assessment of separate interests in land, the law requires an assessment of the value not of one interest in the land, but of the land itself; that is, the assessed value of the land must represent all interests therein including leases and the fee.
This means that despite a mortgage, lease, or sublease of the property, a landowner will still be taxed as though he possessed the property in fee simple. The general property tax ignores fragmenting of ownership and seeks payment from only one owner. An encumbrance or restriction such as an easement will not per se reduce the assessment value of land simply because the owner has been divested of some proprietary interest. However, this does not mean that an assessment may be made without regard to the effect of an encumbrance on the value of the land. The encumbrance becomes one factor among many the appraiser must consider in determining the just value of the property to be taxed.
 51 Fla.Jur.2d, Taxation § 17:406 (footnotes omitted).
Century Village, 449 So.2d at 380-81.
The general rule derived from the cases involving contested assessments is that the property appraiser's assessment carries a strong presumption of correctness which will not be disturbed by the courts as long as the property appraiser, consistent with his statutory duty, considered each and every statutory criterion in assessing the property and there is competent, substantial evidence to support the appraiser relying more heavily upon one criterion over the other. Given that general rule, the trial court in this case erred in overruling the appraiser's valuation of the property. A property appraiser can consider a statutory criterion and thereafter completely reject it if there is a legitimate reason for the taxing authority's decision. The reason this approach is construed so strictly against the taxpayer is to prevent the courts from becoming inundated with taxpayer lawsuits challenging property assessments. Also, courts have recognized a property appraiser's work is specialized and highly judgmental. See, e.g., Canterbury Towers, 462 So.2d at 501.
The trial court attempted to fashion a fair result,[3] which the majority affirms. I *1225 believe, however, a court's scope of review in this area is so limited that fairness is not the issue to be considered in this appeal.
I am unpersuaded that Walter v. Schuler, 176 So.2d 81 (Fla. 1965), a case upon which Judge Lehan relies, mandates an affirmance of the trial court's judgment. The Schuler court held that a just valuation of property is 100% of its fair market value and that the property appraiser may not use unbridled discretion to establish a valuation. In this case, I do not see even a hint of unbridled discretion in the method the property appraiser utilized to value the subject property. Significantly, the trial judge made a specific finding that the appraisal method was not improper.
In Palm Corporation v. Homer, 261 So.2d 822 (Fla. 1972), another case upon which Judge Lehan relies, our supreme court reinstated a trial judge's order lowering a property assessment where the tax assessor failed to utilize the income criterion, one of the statutorily mandated criteria required by section 193.011, solely because the taxpayer refused to furnish its income figures. The court based its decision on the finding that the assessor's stated reason for not using the income criterion was "not sufficient." Palm Corp., 261 So.2d at 823. The trial court in the case before us did not find that Schultz's reason was insufficient, but only that the assessment was unfair based upon previous assessments of the same property. The decision of Palm Corp., therefore, does not mandate an affirmance of the trial court's order and, in fact, supports the conclusion advocated by this dissent that a property appraiser may decline to use one of the statutory criteria if there is a legitimate reason supporting that decision.
This will be the first case in Florida which declares that a property appraiser must give at least some weight to each of the statutory criteria and build it into the final valuation of property. This decision goes far beyond the present status of the case law and, in my opinion, conflicts with the supreme court opinions in Valencia Center and Nolte and this court's decision in Canterbury Towers. I suspect it will engender many more cases of this type both at the trial and appellate levels and perhaps cause the supreme court to establish firm definitions for the terms "consider," "use," and "weigh."

ON MOTION FOR REHEARING, REHEARING EN BANC, AND FOR CERTIFICATION
Appellants have filed motions for rehearing and rehearing en banc of this court's opinion filed July 21, 1989. We deny the motion for rehearing. As to the motion for rehearing en banc, no member of the full court voted to rehear the case en banc. See Fla.R.App.P. 9.331(c)(1). Appellants also have filed a motion for certification which we grant in part. Accordingly, we certify the following question to the Florida Supreme Court as being of great public importance:
WHAT IS THE PROPER METHOD OF ASSESSING FOR AD VALOREM PURPOSES INCOME-PRODUCING PROPERTY WHICH IS ENCUMBERED BY A LONG-TERM LEASE WHICH DOES NOT RETURN TO THE OWNER RENT CONSISTENT WITH THE CURRENT RENTAL VALUE FOR SIMILAR PROPERTY?
FRANK, J., concurs.
LEHAN, A.C.J., concurs specially with opinion.
*1226 LEHAN, Acting Chief Judge, concurring specially.
I agree with the denial of the motion for rehearing and that no basis exists for consideration of the motion for rehearing en banc. I also agree with the granting of the motion to certify. Nonetheless, I write separately for two reasons: first, to say respectfully why I would not certify the question as phrased by the majority, which is phrased as the property appraiser's motion has asked; second, to address the argument made by the property appraiser in the motion, which takes a somewhat different approach from that made in his briefs and which presumably will be made to the supreme court.
If a question is important enough to be certified by a district court of appeal to the Florida Supreme Court, it should of course be important enough to contain the legal issue involved. In my view such a question should not, as does in effect the question certified in this case, do no more than ask how a case involving particular facts should be decided. A question so certified should not thereby be susceptible of the inference that this court is neutral, rather than being of assistance to the Florida Supreme Court by putting into focus the basis on which this court has decided the case and which is considered to be appropriate for supreme court review. See Fisher v. Shenandoah General Construction Co., 498 So.2d 882, 883 (Fla. 1987) (appropriately phrased certified question contains issue upon which decision in case should turn).
As we all certainly agree, district courts of appeal were not created to be conduits through which the resolution of important issues fully considered by the court and not requiring immediate resolution by the supreme court pursuant to Fla.R.App.P. 9.125 may be simply passed through to the supreme court. Of course, none of the opinions by the panel members in this case has done so, and there appears no reason for the certified question to indicate otherwise.
I would certify a more meaningful question which puts the legal issue into focus as follows:
IN ASSESSING THE JUST VALUATION OF PROPERTY WHICH IS SUBJECT TO A LEASE WHICH HAS A LONG TERM REMAINING AFTER THE DATE OF THE ASSESSMENT AND WHICH PROVIDES FOR SUBMARKET RENT, MAY A PROPERTY APPRAISER WHOLLY DISREGARD THE INCOME APPROACH TO THE VALUATION OF THE PROPERTY AND THEREBY ASSESS THE PROPERTY AT A FIGURE WHICH EXCEEDS ITS FAIR MARKET VALUE?
That question is not focused upon in the property appraiser's motion. The motion instead undertakes to place this case in a different light as to which, it seems to me, we should express our view, as I do here.
Central to the well-presented argument in the motion is the apparent position that the trial court and the majority of this court have required an assessment at a figure less than the property's fair market value (which the motion also appears to refer to as "true market value" and simply "market value") by requiring an assessment at a figure less than the value of the unencumbered property. Actually, however, the property involved in this case is not unencumbered, and the property appraiser's assessment of the property, which was as though it were unencumbered, was, therefore, at a figure substantially greater than the property's fair market value.
The term "fair market value," which is synonymous with "just valuation" as required by section 193.011 and the Florida Constitution, is essentially the price for which property could be marketed. Of course, the property in this case could be marketed only by its owner and only as encumbered.
Thus, the actual effect of the argument in the property appraiser's motion appears to be to take the position that the property was properly assessed by him at a fictitious fair market value figure. Whether or not such an assessment was proper is the determinative aspect of this case which in my view the certified question should reflect.
NOTES
[1] While the appeal and the briefs in support thereof are by the Executive Director of the Florida Revenue Commission, as well as the Property Appraiser of Pinellas County, their appeal and arguments are, for simplicity, referred to in this dissenting opinion as those of the property appraiser.
[2] The testimony of the property appraiser's expert included the following question and answer:

Q: What weight, if any, was given in valuating the  or assessing the subject property to the 1986 assessment to the income approach?
A: There was no weight given to the income.
That the property appraiser's expert gave no weight to the market approach (which the appellee's expert called the sales comparison approach), is shown by the following question and answer:
Q: What weight, if any, was given in assessing the subject property to the market approach?
A: There was no weight given.
Thus, in light of the below-described testimony of appellee's expert, there was evidence before the trial court that the property appraiser had not given weight to two of the three main approaches generally used in combination in real property appraisals (the income, cost, and market, or comparable sales, approaches).
[3] Section 193.011 does not literally require that an assessment not exceed fair market value. In fact, the wording of that section only calls for the "consideration" of fair market value, i.e., of "the present cash value of the property, which is the amount a willing purchaser would pay a willing seller." But, if "consideration" in that context were always to mean merely having thought about the fair market value factor, as well as the other factors required by that section to be considered, a property appraiser could then, contrary to legislative intent, freely assess property at any level he pleases. Thus, there has been in effect superimposed upon the requirements of section 193.011 the requirement that no assessment exceed fair market value. See Valencia Center III; Walter v. Schuler.
[4] The applicable Michigan statute was amended subsequent to the decision in C.A.F. Investment to provide that the "usual economic return realized from the lease or rental of property negotiated under current, contemporary conditions," instead of the "actual income generated by the lease or rental of property," shall be considered under the income approach. See Carriage House Cooperative v. City of Utica, 172 Mich. App. 144, 149, 431 N.W.2d 406, 409 (Mich. Ct. App. 1988). That amendment does not reduce, and may be considered to enhance, the precedential value of C.A.F. Investment in the case at hand inasmuch as Florida has no statute like that Michigan amendment. In fact, the Florida legislature enacted a statute, section 191.023(6), which is discussed below and which in the context of this case is contrary to the foregoing Michigan amendment and consistent with C.A.F. Investment.
[5] The property appraiser thereby appears to candidly disregard, as did in effect the trial court, an apparently erroneous affirmative answer to a leading question put by appellee's counsel to the property appraiser's expert asking if the property's fair market value was $4,247,840 and its just value was $3,981,400. (The reply brief then goes on to argue, apparently with reference to appellee's expert's fair market value figure, to the effect that the property's fair market value need only be one of the factors to be considered by a property appraiser in arriving at his assessment.) There does not appear to have been any other testimony by the property appraiser's expert placing a fair market value figure on the property. Nonetheless, even if there were considered to be conflicting testimony as to a fair market value figure, the trial court was entitled to accept that of appellee's expert under the circumstances of this case. See Blake v. Farrand Corp., 321 So.2d 118, 119 (Fla. 3d DCA 1975), cert. den., 330 So.2d 14 (1976) ("The determination of the weight to be accorded to the expert testimony of the real estate appraisers rested upon the trial judge, as trier of the facts, and if competent substantial evidence is introduced demonstrating that the tax assessor's assessment is erroneous, he may reduce that assessment.")
[6] There is an additional argument of the property appraiser, for which Century Village is cited, that submarket rent under the lease may be ignored and market rent (rental value on the current market) used instead. This argument, which was rejected in C.A.F. Investment Co. and Folsom, supra, appears to produce the same result as the argument for valuing the property as though there were no lease, as the Century Village opinion indicates. 449 So.2d at 379, 380. In any event, either argument is in support of the property appraiser's failure to weigh the rent receivable under the existing lease, the propriety of which is, as indicated above, at the heart of the issue in this case. And the property appraiser in this case, in arriving at his assessment, simply did not use the income approach and did not weigh market rent.
[7] One reason is that for present purposes the correctness of the decision in that case is assumed. Accordingly, it is assumed that that decision was not to penalize unfairly a property owner, as did the assessment in this case, who could not within a relatively short time shift the burden of increased taxes to the party benefitting from what caused that burden. Also, as explained below, such shifting could have been done by the owner of the common area in Morganwoods Greentree, upon which Century Village relied, and by the property owner in Valencia Center I, upon which Century Village additionally relied. Furthermore, as is indicated above and is further explained below, an assessment resulting from a disregard of the income approach for property subject to a submarket rent lease, as in Century Village, could only for such property subject to a short-term lease fulfill the requirement that an assessment not exceed fair market value.
[8] To accommodate fairness, a tax on the lessee's interest under these circumstances may be argued to be the way for government to accomplish its apparent aim of increasing revenues.
[9] While, as indicated above, the Morganwoods Greentree opinion refers first to the general rule of valuing leased property as though there were no lease (actually, taxing the property owner "despite the ... lease ... as though he possessed the property in fee simple." 341 So.2d at 758) and then, immediately thereafter, refers to valuing property with an encumbrance, such as an easement, by taking into consideration the encumbrance, the reference to a lease was, of course, dictum since that case involved the effect of easements and restrictions upon the valuation of property. In any event, the reference to encumbered property also referred to leased property because a lease is a form of encumbrance against property as, in fact, Century Village specifically recognized. 449 So.2d at 379. The dissenting opinion of Judge Beranek in Century Village includes a lease within the term "encumbrance" as used in Morganwoods Greentree and Valencia Center I. 449 So.2d at 382. Valencia Center I also talks of a lease as an encumbrance. 432 So.2d at 111. This simply accords with the general definition of an "encumbrance" as "[a] claim, lien, charge, or liability attached to and binding real property; e.g. a mortgage; judgment lien; mechanics' lien; lease; security interest; easement or right of way; accrued and unpaid taxes." Black's Law Dictionary 473 (5th ed. 1979) (emphasis added).

A lease no less has an effect upon a property owner's interest in the property than does an encumbrance such as an easement. More particularly, a lease on property calling for submarket rent no less has a diminishing effect up on the value of the property to its owner than does an encumbrance such as an easement. Thus, the language quoted above from Morganwoods Greentree as to the effect of an encumbrance upon the valuation of property applies in this case.
[10] While Valencia Center I and, we conclude, Century Village involved encumbrances, i.e., submarket rent leases, less detrimental to the property owners than the long-term submarket rent lease in this case, those cases did involve encumbrances which were at least somewhat detrimental and which, it could be argued under Morganwoods Greentree, as did Judge Beranek's dissent in Century Village, were not to be totally disregarded (unless the detriment was in effect de minimis which cannot be discerned from the Century Village opinion and which is also not addressed in the Valencia Center opinion). Although, as stated above, we do not in this case take issue with Century Village vis-a-vis short-term leases, it may be noted that the dissent of Judge Beranek can be further supported by the position that Century Village mistakenly relied upon language in Morganwoods Greentree about a lease which was dictum and which should not have been applied to submarket rent lease cases, as explained in the above discussion of Morganwoods Greentree.

On the other hand, leases involving market rent, to which the "general rule" referred to in Morganwoods Greentree presumably would apply, can be said to not involve detrimental encumbrances. An extremely over-market rent lease (which would enhance the value of the property to the owner) may be considered to involve a beneficial encumbrance.
[11] There is no contention that the lease in this case, which is dated January 17, 1969, was not entered into in good faith in an arms-length transaction.
[12] As indicated above, the language in Folsom about including the value of the lessee's interest in the assessed value of property might be read as in effect meaning essentially that the amount of the assessment should not be limited to the value of the ownership interest pursuant to the income approach based upon submarket rent receivable under a long-term lease. Yet, we recognize the literal meaning of that language. It may well be that in that regard Folsom contemplated that after adding to the value of the ownership interest the value of the lessee's interest, the sum of those values would be less than the figure which would be arrived at by assessing the property as though there were no lease or by valuing the ownership interest through an income approach based upon market rent, i.e., upon what the Michigan Supreme Court, as quoted above in C.A.F. Investment, referred to as "hypothetical income." In that regard Folsom also states that the assessor "initially must isolate on the interests involved... ." 106 Wash.2d at 770, 725 P.2d at 993. This would clearly include isolating upon the value of the ownership interest pursuant to the income approach based upon submarket rent, which, as Folsom stresses in the portions of that opinion quoted further above in this opinion, is to avoid disregarding the effect of a long-term, submarket-rent lease upon fair market value. Yet fair market value of the property to the taxpayer who owns the property would appear to be exceeded by including in the assessed value the value f the long-term lessee's interest because a purchaser of the property deciding upon a price to pay for the interest of the tax paying owner would not include in that price the value of such a lessee's interest. Thus, Folsom is confusing in this regard. In any event, Folsom is very clear in addressing what it called "the principal issue" in that case, 725 P.2d at 988, that an assessment method is erroneous if it fails to make any use of the actual income approach to the valuation of property which is subject to a long-term lease calling for submarket rent, as the property appraiser's assessment in this case failed to do.
[1] Section 193.011 provides:

In arriving at just valuation ..., the property appraiser shall take into consideration the following factors:
(1) The present cash value of the property ...;
(2) The highest and best use to which the property can be expected to be put in the immediate future and the present use of the property ...;
(3) The location of said property;
(4) The quantity or size of said property;
(5) The cost of said property and the present replacement value of any improvements thereon;
(6) The condition of said property;
(7) The income from said property; and
(8) The net proceeds of the sale of the property. .. .
§ 193.011, Fla. Stat. (1985).
[2] When explaining what the term "consider" means to him, Schultz's expert stated:

Well, when you're considering something, we go through and do an analysis on properties and consider  we obviously are going to consider using a market approach, using analysis, and we find out that there is nothing that we can come up with to establish a market approach; so, therefore, we did not use the market approach. However, it has been considered.
[3] It is clear from the trial court's own statements during two hearings that it ruled in favor of the taxpayer because the court was unwilling to permit an appraisal valuation to escalate 89.1 percent in one year. The trial court stated the following:

In the prior years, whether the methodology be to the best benefit of the county or not, the appraisals have risen by acceptable, reasonably-anticipatable amounts allowing a reasonable owner to adjust his monetary recompense in accordance with the tax liability to be anticipated. Absent the substantial improvement of property and especially considering instances wherein property is not changed, altered, improved, and the use of the property remains the same, it is beyond the area of reasonable expectation for a property owner to anticipate a valuation increase of 89.1 percent. If the County had been appraising the property by a method less beneficial in the past, and the County has the legal authority to appraise it in a method more beneficial, it would seem that the greater equity would require that this be done incrimentally [sic], not in one lump sum.
The power to tax is the power to destroy. There is not a person in this room who would continue to economically survive if his or her tax basis were increased in one year in the amount of 89.1 percent, whether those taxes be real or personal or income.
The methodology which the County chose to use in 1986 had been available to them, literally, for years. They had not chosen to use it. There's no evidence that the landowner was given notice that the methodology of the appraisal would be changed. There is no evidence that the taxing authority sought to diminish by incrimental [sic] action the increase.
... .
The case law notwithstanding, the court is faced with an evaluation [sic] jump of a manifest amount nearly equaling a doubling of the evaluation [sic] from the prior year; less than 11 percentage points away from a total doubling.
On the face of it, it would appear, that this amount of taxation would be grossly excessive and subject to judicial striking.
The other alternative I have is that it is a mistake.
The other alternative is that it was arbitrary, all though [sic] I am not particularly moved to accept an opinion of arbitrary calculations because Mr. Bova [the property appraiser's expert witness] has now, to my satisfaction, explained the methods by which the methods of 1986 evaluation [sic] was reached, but no one to my satisfaction has explained how that evaluation [sic], if it was correctly done, can exceed the prior years evaluation [sic] to such a great extent.
... .
It is from circumstances such as this that historically rebellion has flaired [sic]... . That 89.1 percent increase in one year absent substantial addition or improvement to the property, or absent the discovery of oil or precious stones, is simply judicially inconscionable [sic]. The power to tax is the power to destroy.